# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 2, 2008 Session

## STATE OF TENNESSEE v. ANTHONY ALLEN

**Appeal by permission from the Court of Criminal Appeals
Criminal Court for Shelby County
Nos. 00-10541-47; 00-10550-56    John P. Colton, Jr., Judge**

---

### No. W2006-01080-SC-R11-CD - Filed June 24, 2008

---

AND

## STATE OF TENNESSEE v. ERIC LUMPKIN[1]
**Appeal by permission from the Court of Criminal Appeals
Criminal Court for Shelby County
No. 03-08391    W. Mark Ward, Judge**

---

### No. W2005-02805-SC-R11-CD - Filed June 24, 2008

---

We granted permission to appeal in these consolidated cases to determine whether Tennessee's consecutive sentencing scheme passes constitutional muster under the holdings of Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004).  We also address the "physical facts rule" in Defendant Lumpkin's case. We hold that the trial courts' imposition of consecutive sentences in these cases did not violate the Defendants' federal constitutional rights.  We also hold that the physical facts rule does not require the reversal of Defendant Lumpkin's convictions. Accordingly, we affirm the judgments of the Court of Criminal Appeals in both cases.

**Tenn. R. App. P. 11; Judgments of the Court of Criminal Appeals Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

---

[1]The record contains two spellings of this Defendant's name: "Eric Lumpkin" and "Eric Lumpkins."  The Defendant's attorneys spell his last name "Lumpkin" and the Defendant's father's last name is spelled "Lumpkin." For ease of reference and reading, we use the spelling "Eric Lumpkin."

William D. Massey, Lorna S. McClusky, and Massey McClusky, Memphis, Tennessee, for the appellants, Anthony Allen and Eric Lumpkin; Thomas E. Hansom, Memphis, Tennessee, for the appellant, Eric Lumpkin (at trial).

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and William S. Crossnoe, Assistant District Attorney General, for the appellee, State of Tennessee, in State v. Allen.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee and Stacy McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee, in State v. Lumpkin.


# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Defendant Allen

A jury convicted Defendant Allen of multiple counts of aggravated rape and aggravated robbery. These convictions arose out of three incidents in which Defendant Allen participated with the same cohort. On December 19, 1999, the two men entered an establishment named "Brandy's" where they accosted two women with a gun, robbing and raping them. On December 20, 1999, the men entered "Southern Belles" with guns drawn and raped and robbed at gunpoint three women. On January 14, 2000, the two men visited the Flamingo Club. They enticed two women into their car and then drew guns. The men drove to a hotel room where the men robbed and raped the two women at gunpoint.

On direct appeal, the Court of Criminal Appeals reversed and remanded for a new trial one of the aggravated rape convictions; affirmed the remaining four aggravated rape and seven aggravated robbery convictions; and remanded for resentencing on those offenses. See State v. Allen, No. W2004-01085-CCA-R3-CD, 2005 WL 1606350 (Tenn. Crim. App. July 8, 2005).[2] On remand, the trial court sentenced Defendant Allen to an effective term of 104 years by ordering some of Defendant Allen's sentences to run consecutively. Specifically, the trial court imposed consecutive sentences after finding that Defendant Allen's "extensive criminal activity justifies the administration of a consecutive sentence," basing this finding on the offenses for which he was being sentenced. The trial court also determined Defendant Allen to be "a dangerous offender," making the following written findings:

> After considering the statutory criteria and the purposes and principles of consecutive sentencing, the Court finds that the defendant is a dangerous offender

---

[2]We have drawn our summary of Defendant Allen's criminal conduct from this opinion. See Strader v. State, 362 S.W.2d 224, 226 (Tenn. 1962) (recognizing that this Court may take judicial notice of the statement of facts in a prior opinion in the same case). The transcript of Defendant Allen's trial is not included in the record before us, presumably because Defendant Allen is challenging only the trial court's authority to order consecutive service of his sentences.

according to the definition stated in Tenn. Code Ann. § 40-35-115(b)(4). The defendant systematically terrorized a number of females over the course of a month. He demoralized, robbed, and raped these women with an absolute disregard for human life which was made obvious by his unprovoked actions. What female was to be victimized was unimportant to the defendant. His random acts demonstrate that he did not hesitate to commit a crime in which the risk to human life was high. The defendant's conduct clearly satisfies the condition stated in Tenn. Code Ann. § 40-35-115(b)(4), therefore, the defendant is a dangerous offender.

The trial court also found specifically that the effective term of 104 years reasonably related to the severity of the crimes Defendant Allen committed and that consecutive sentences were necessary to protect the public from further crime by Defendant Allen.

Defendant Allen appealed from his resentencing on the grounds that the trial court's imposition of consecutive sentences violates the Sixth Amendment as interpreted by the Supreme Court in Apprendi and its progeny. Defendant Allen does not challenge the trial court's findings of fact, but rather the court's authority to make them and use them to impose consecutive sentences. The Court of Criminal Appeals affirmed Defendant Allen's sentences.

## II. Defendant Lumpkin

A jury convicted Defendant Lumpkin of one count of first degree premeditated murder; one count of attempted premeditated murder; and two counts of aggravated assault. A summary of the proof adduced at trial follows.

Leland and Bishop Tatum[3] lived in the adjoining halves of a duplex at 895 Speed Street in Memphis, Tennessee. This duplex was located above street level and had a front porch with twelve steps leading down to the street level. Each side of the duplex had a door opening onto the front porch. Across the street lived Jerry Lumpkin, Defendant Eric Lumpkin's father. Jerry's residence also sat above street level and also had a front porch with several steps leading down to street level. Next door to Jerry lived Leland and Bishop's mother, Emma Tatum. Some years prior to the events giving rise to this trial, Bishop Tatum and Jerry Lumpkin quarreled. The feud had not been abandoned.

On the evening of July 19, 2003, Leland and Bishop Tatum were conversing on their front porch. A short time earlier, Defendant Lumpkin had asked Leland if Leland knew where to obtain some "dope" for Defendant Lumpkin to smoke. Leland ignored this query. While Leland and Bishop were on their porch, Defendant Lumpkin was across the street on his father's porch. Leland testified that Defendant Lumpkin called out and told Leland to "ask [Bishop] to come down the steps so [they] can fight." Leland and Bishop ignored him. Defendant Lumpkin repeated his challenge, adding

---

[3]When he took the witness stand, Bishop Tatum introduced himself as "Bishop Fredric L. Tatum." On cross-examination, he acknowledged that "Bishop" was a title. However, all of the other witnesses referred to him in their testimony as "Bishop," using that word as a first name would typically be used. Therefore, we use that designation, where appropriate, as well.

"because I don't like him and never have." The two men again ignored the taunts. Defendant Lumpkin then walked across the street and began walking up the porch steps to where Leland and Bishop were standing. When Defendant Lumpkin reached the second step, Leland told him that he was "starting trouble" and that he needed "to turn around and go back to whatever [he] was doing, go back across the street." Jerry came across the street and "grabbed [Defendant Lumpkin] and took him back over there."

Emma Tatum then joined Leland and Bishop on their porch. One of the men called the police. While they were waiting for the police to arrive, a man Leland knew as "Mr. Johnson" came and picked Defendant Lumpkin up in a red car and drove him away.

The police arrived and spoke with Bishop for a few minutes. Leland testified that soon after the police left, he heard Jerry Lumpkin say into his cordless phone, "go get your gun." Jerry had walked down his porch steps and was passing by on his way up his driveway when Leland overheard Jerry's words. Hearing this alarmed Leland "a little."

Leland's wife joined the other three people on the Tatums' porch. While they were talking, Emma Tatum told them to "look" and pointed out that the same red car that had just left with Defendant Lumpkin was returning. Leland turned and looked and acknowledged that it was the same car. As the car drove down their street, Emma Tatum said, "look out you-all, he's got a gun." Leland testified that, as he

> turned around and looked that's when the first shot was fired. And, the first shot was fired like near the driveway . . . . And the second shot was fired as though it's going almost near the house. . . . Then he fired the third shot. . . . But, that fourth shot, when he fired the fourth shot, my mother was trying to get into the house, she was pushing my brother inside the door then.

According to Leland, the fourth shot hit Emma Tatum because after that shot, he heard her "holler" that she had been hit. A fifth shot was fired. The car got to the corner and made a right turn and stopped. Leland testified that, as he was looking at Defendant Lumpkin, who was in the passenger seat of the red car, Defendant Lumpkin fired a sixth shot. Leland was approximately twenty-five feet from Defendant Lumpkin at this time. Defendant Lumpkin was not wearing a mask and Leland got "a good look" at him. After firing the sixth shot, the car in which Defendant Lumpkin was riding "proceeded on. And he left."

Leland stated that, "when he fired the first shot everybody was like in a panic, . . . trying to run." As his mother and brother were trying to get inside the house through one door, he "had to push [his] wife down on the porch, push her down and hold the door open on [the other] side, holding the door so she could crawl inside the house." After he helped his wife get inside, he "was trying to run over to [his] mom to push her inside . . . but [he] just didn't get there fast enough."

When asked where his mother was at the time she got shot, Leland testified:

-4-

She was, my mother was going inside the door.  The door was open and when she got hit from that bullet she was standing up, she was pushing my brother inside during that time.  Pushing him inside the house.  She was on her way through the door, trying to get in.  That's where she was at.  She was trying to get in, she wasn't directly in the house, she was trying to get inside the house.

According to Leland, Defendant Lumpkin and his mother were on speaking terms and he knew of no problems she had ever had with Defendant Lumpkin.  Leland also testified that he had had no problems with Defendant Lumpkin or Defendant Lumpkin's father.

On cross-examination, Leland testified that he saw no gun "out there" other than the one he saw Defendant Lumpkin holding and shooting.  He described its color as "[c]hrome, silver chrome."  The time was between 7:30 and 8:00 in the evening.  He admitted that he had heard his brother Bishop refer to Jerry Lumpkin as a "dope dealer."  He also explained that, after Defendant Lumpkin initially crossed the street and told Bishop that he wanted to fight, Bishop told Defendant Lumpkin, "you don't know who you're messing with" and that he would "whip [Defendant Lumpkin] like [his] mother should have whipped [him]."

Bishop Tatum testified that, on the evening of the shooting, he saw Defendant Lumpkin fighting with one of his father Jerry's friends in Jerry's yard.  After the fight, Defendant Lumpkin came over and told Bishop he wanted to fight Bishop.  Leland intervened and said, "no, ain't going to be none of this."  Jerry Lumpkin crossed the street and retrieved his son.  Jerry then asked a man named Johnson to take Defendant Lumpkin home, and Johnson picked Defendant Lumpkin up in a red four-door car.  Bishop thought that Leland then called the police.  The police arrived and took a report.

After the police left, Bishop and Leland were standing on the sidewalk.  Bishop heard Jerry tell someone over the cell phone to "kill everybody on the porch."  Bishop and Leland returned to their porch.  A few minutes later, Bishop saw the red car at the corner of his street.  His mother said, "he got a gun."  Bishop described the gun as "black."  Bishop testified that he saw Defendant Lumpkin "pointing out the car and he started shooting."  Bishop stated that Harry Johnson was driving the car.  In an effort to avoid the bullets, Bishop pushed his mother down and she pushed him down.  He said that there were about six shots.

Bishop stated that the car in which Defendant Lumpkin was riding drove "slow" as it passed their house.  Bishop saw Defendant Lumpkin "in the front seat but laying back.  He was shooting out the car."  Defendant Lumpkin was on the right side of the car shooting out the right back window.  Bishop testified that it was still daylight during the shooting and he saw Defendant Lumpkin's face clearly.  When the first shot was fired, they "ducked . . . [and] pushed one another down on the porch."  Bishop stated that he did not have a gun at the time and nobody on the porch shot at Defendant Lumpkin.

Bishop Tatum acknowledged that he had had a disagreement with Jerry Lumpkin the first time they met several years previously.  The problems continued over the years with Bishop calling the

police about drug dealing on the street and Jerry threatening him after the calls. He did not have any problems with Defendant Lumpkin, however, prior to the July 19, 2003, shooting.

Bishop testified that his mother was standing when she got shot but he also stated that she was "bending" during the shooting. He could not describe how she was "bending" because he was looking at Defendant Lumpkin "the whole period of time when he was shooting." He stated, "I pushed my mama down when the first shot up [sic], okay. My mother was trying to push me down, I was pushing her down."

Essie Tatum, Leland's wife, testified that she and Leland arrived at the duplex between 6:30 and 7:00 p.m. Bishop was there when they arrived. She went inside and later saw the victim outside talking with Leland and Bishop. It was then between 7:30 and 8:00 p.m. She went out on the porch and "all of a sudden" she heard Leland say "they shooting." The next thing she knew, she was pushed down onto the porch and she crawled through the door. She heard the victim say she had been shot. She did not see the shooting but she heard the shots.

Harry Johnson testified that he had known Jerry Lumpkin about forty years and Defendant Lumpkin about fifteen years. He arrived on Speed Street at about 7:00 p.m. on July 19, 2003. As he was driving by Jerry's house, Jerry beckoned for him. When he responded, Jerry asked Johnson to take Defendant Lumpkin home. When Jerry made this request, Jerry and Defendant Lumpkin "exchanged some words, like a heated argument." As requested, Johnson took Defendant Lumpkin home. The time was between 7 and 8 p.m. Johnson took Defendant Lumpkin over to Olympic Street, "about three streets over." The trip took three or four minutes. After he dropped Defendant Lumpkin off, a woman came out on the porch and "hollered" at him. He stopped and Defendant Lumpkin came out of the house and got back in the car. Defendant Lumpkin told him he wanted to go back to his father's house. Johnson complied; he did not see a weapon.

Johnson described his car as a 1991 Cutlass Supreme, red, four-door with reclining seats in the front. Johnson stated that, when Defendant Lumpkin got back in the car, he "immediately reclined the seats." Defendant Lumpkin's demeanor was tense and "stressed out." The trip back to Speed Street took three to five minutes. The sun had set but there was still light. As Johnson was looking for a parking place on Speed Street, Defendant Lumpkin told him not to worry about parking. At that point, Johnson testified, "gunfire erupted." Johnson did not initially realize where the gunfire was coming from; he ducked. Johnson testified: "After about five shots [Defendant Lumpkin] sat up but didn't let the seat up and reached over and grabbed my steering wheel and said, pull off fool." Johnson described himself at this time as "in somewhat of a panic." He saw that Defendant Lumpkin had a pistol "when he brought his hand back in the window." Johnson described the gun as "a large caliber revolver, blue steel with about a six inch barrel." He had not seen the gun previously and did not know that Defendant Lumpkin had a gun in his possession.

Johnson testified that, when the shooting started, he

-6-

like panicked, [he] was ducking and trying to determine where the shots were coming from. And, at which time [Defendant Lumpkin] grabbed the steering wheel, reached over and grabbed the steering wheel, stuck his foot on the accelerator and hollered, drive fool. And, that's when [he] seen [sic] the pistol in [Defendant Lumpkin's] hand.

Both men struggled for control of the car. They reached the corner where there was "a bunch of people." Defendant Lumpkin continued to press on the accelerator and the car "almost ran into" the people gathered at the corner. Their flight continued with Defendant Lumpkin steering and pressing the accelerator, running stop signs, and getting "very close" to striking pedestrians. After traveling down several streets, Defendant Lumpkin jumped out of the car. He told Johnson that Johnson "don't know nothing and don't want to know nothing, forget about it." Johnson became fearful for his life because Defendant Lumpkin had been "shooting on a crowded porch of people, that appeared to be someone out of control and don't care anything about anyone."

On cross-examination, Johnson stated that his car was stopped in front of the duplex when the gunfire began. Then Defendant Lumpkin grabbed the steering wheel and pushed the accelerator down. They drove to the corner and turned; they did not stop at the corner and Johnson did not recall Defendant Lumpkin firing another shot at the corner.

Officer Devin Rogers of the City of Memphis Police Department testified that he responded to the Tatums' first call to the police, which was made before the shooting. He spoke with both Leland and Bishop. He then left and returned to his regular patrol. He responded to the second call, made after the shooting, and arrived at 9:06 p.m. He found "a lot of hysteria and pandemonium because Ms. Tatum had been shot." Leland told him Defendant Lumpkin had shot his mother; Bishop reiterated this information. Officer Rogers requested an ambulance. Emma Tatum was taken to The MED hospital where she underwent several surgeries. Emma Tatum remained in the hospital where she died on September 13, 2003.

Sergeant Maurice Savage of the City of Memphis Police Department testified that he participated in the ongoing investigation of the shooting and arrested Defendant Lumpkin on July 22, 2003.

Dr. O'Brian Cleary Smith, previously the medical examiner for Shelby County, testified that his office performed an autopsy on the victim, Emma Tatum. He opined that the victim "died as a result of a gunshot wound to the pelvis." The autopsy revealed that the bullet entered the victim's body on the right buttock and lodged in the left hip joint. Dr. Smith testified that the "bullet entered her body going slightly from back to front with up and down and right to left to lodge in the socket of her hip joint on the left side of her body." He explained that, assuming the perspective of a person standing upright when shot,

[t]he bullet would have traveled first off from the right side of her body to the left side. It also would have descended in the body or going down in the body to a point lower than where it entered. And, it also would have gone from the back side of the body

more forward towards the front but actually more like in line with the hip joint which is not fully to the front.

On cross-examination, Dr. Smith was asked to hypothesize that the bullet that struck the victim was fired from a car driving along a street that was several feet below the level of the porch on which the victim was located when she was shot and that the victim was standing upright at the time she was shot. Dr. Smith responded that, "[g]iven that description of circumstances it's difficult to resolve," referring to the trajectory of the bullet through the victim's body. He said that, if the bullet had been fired in an upward direction, "she would have to be leaning over or canted over towards the right side, towards the bullet." Given a different hypothetical in which the bullet was fired from the porch across the street, and in which the victim was standing upright on both feet, Dr. Smith stated that "it would be easier to achieve that trajectory of the bullet through her body by a person who's standing on that porch and shooting slightly downward."

On redirect, Dr. Smith reiterated that "it's very difficult to render an opinion as to what exact position a person was in at the time that they received the gunshot wound." He testified that "[i]f a person is being pushed down or pushed off to the side, . . . with the right side of the pelvis is lower and the left side of the pelvis is higher then it may be possible for a wound of that type to be produced by a shot fired from below." Dr. Smith also testified that it was possible for a gunshot fired from the street up toward the porch to have caused the path in the victim's body if the victim had been crawling on the palms of her hands and knees with her head "a little bit angled towards the street and also have the left side of [her] pelvis higher than [her] right." Dr. Smith further acknowledged that it was possible for the bullet to have changed paths if the bullet had struck an object prior to hitting the victim's body.

Defendant Lumpkin presented no proof. His defense theory focused on weaknesses in the prosecution's case, particularly the incongruities between the angle at which he allegedly fired the gunshots and the bullet's path through the victim's body.

The jury convicted Defendant Lumpkin of the first degree murder of Emma Tatum; the attempted first degree murder of Bishop Tatum, a Class A felony; the knowing aggravated assault with a deadly weapon of Leland Tatum; and the knowing aggravated assault with a deadly weapon of Essie Tatum, both Class C felonies. Defendant Lumpkin was subsequently sentenced to life imprisonment for the murder; to twenty-three years imprisonment for the attempted murder; and to five years imprisonment for each of the aggravated assaults. The trial court ordered the sentence for the attempted murder to run concurrently with the life sentence. The trial court ordered the sentences for the aggravated assaults to run consecutively to each other and to the other sentences, resulting in an effective term of life plus ten years.

In ordering consecutive service, the trial court found Defendant Lumpkin "to be a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." The trial court further found that "the circumstances surrounding the commission of the offense are aggravated" on the basis that it was a drive-by shooting in which four people could have been killed and that Defendant Lumpkin then took flight from the scene by "taking control of the vehicle, running stop signs and . . . almost ran over other people while

he was in flight." In conjunction with finding Defendant Lumpkin to be a dangerous offender, the trial court determined that "confinement for an extended period of time is necessary to protect society from [Defendant Lumpkin's] unwillingness to lead a productive life and [Defendant Lumpkin's] resort to criminal activity." Finally, the trial court found that "the aggregate length of the sentences . . . reasonably relate[s] to the offense which [Defendant Lumpkin] was convicted of."

Defendant Lumpkin appealed, arguing that his convictions should be overturned on the basis of the "physical facts rule" and that the trial court's imposition of consecutive sentences violated his federal constitutional rights.[4] The Court of Criminal Appeals affirmed Defendant Lumpkin's convictions and sentences.

## ANALYSIS

### I. "Physical Facts Rule"

Defendant Lumpkin challenges the sufficiency of the evidence underlying his convictions by asking this Court to disregard the eyewitness testimony identifying him as shooting several shots as he sat in a car that was driving slowly past the elevated porch on which the victims were gathered. He makes this request based on the physical facts of his location at the time he fired the shots combined with the trajectory of the bullet that killed Ms. Tatum and the path that bullet took through her body. Relying on the "physical facts rule," he argues that the "immutable physical law of gravity" renders incredible as a matter of law the witnesses' testimony identifying him as the shooter. And without the identification testimony, he argues, there is insufficient evidence to support his convictions.

The physical facts rule may be applied in criminal cases. State v. Hornsby, 858 S.W.2d 892, 893 (Tenn. 1993). In Hornsby, this Court recognized that

> [t]he so-called "physical facts rule" is the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded. That is, where the testimony of a witness "cannot possibly be true, is inherently unbelievable, or is opposed to natural laws," courts can declare the testimony incredible as a matter of law and decline to consider it. United States v. Narciso, 446 F.Supp. 252, 282 (E.D.Mich. 1977). As stated by the Court in Wood v. United States, 342 F.2d 708, 713 (8th Cir. 1965), "where undisputed physical facts are entirely inconsistent with and opposed to testimony . . . the physical facts must control. No jury can be allowed to return a verdict based upon oral testimony which is flatly opposed to physical facts, the existence of which is incontrovertibly established." Courts have made it clear that in order for testimony to be considered incredible as a matter of law, it must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature. Thus, for example, if a witness was to testify that he saw the sun set in the east, the court would be free to declare such testimony incredible as a matter of law and disregard it.

---

[4]Defendant Lumpkin does not challenge his consecutive sentences on any other basis.

Id. at 894 (citations omitted). When determining the sufficiency of the evidence, then, an appellate court is not bound to consider a witness' testimony if it is impossible to reconcile with physical evidence. Id.

The physical facts rule may be applied to negate testimony only where the physical facts at issue are "'well-established and universally recognized physical laws.'" Id. at 895 (quoting Nelms v. Tenn. Farmers Mut. Ins. Co., 613 S.W.2d 481, 483 (Tenn. Ct. App. 1978)). Significantly, "the rule may not be invoked 'where its application depends upon assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of [objects].'" Id. (quoting Waller v. Morgan, 133 S.W.2d 614, 616 (Tenn. Ct. App. 1939)).

In this case, the physical fact upon which Defendant Lumpkin rests his argument is the path taken by the bullet through the victim's body. He contends that the "immutable physical law of gravity" renders impossible the eyewitness testimony that he fired the fatal shot while sitting in a car at street level because the victim was uphill from him. Defendant Lumpkin relies on Leland Tatum's testimony that Emma Tatum was "standing up" when she was shot and Dr. Smith's acknowledgement that there was "no way" a bullet fired from the street could travel through her body on the path it took if she were standing upright at the time the bullet struck her.

We acknowledge that Leland testified that his mother was "standing up" at the time she was shot. Bishop's testimony was less clear, however. He testified variously that (1) once the shooting started, he and his mother were ducking and pushing each other down; (2) his mother was standing when she was shot; and (3) she was "bending" during the shooting. Yet, Leland and Bishop also testified that they were watching Defendant Lumpkin during the shooting. Neither of them testified that they actually saw their mother get shot. Additionally, their testimony established that four people were simultaneously trying to get inside the duplex to avoid being shot and that their attempts to avoid the gunfire were chaotic. The conflicting testimony together with the circumstances surrounding the shooting render inconsistent at best the witnesses' assertions regarding the attitude of the victim's body at the time she was shot.

Dr. Smith testified that the victim's wound could have been sustained from a gunshot fired below her if she were "being pushed down or pushed off to the side" or if she had been on her hands and knees at the time she was shot. While no one testified specifically that Emma Tatum was on her hands and knees at the time she was shot, Bishop testified that he had been "pushing her down" during the shooting. His testimony is therefore not irreconcilable with the physical facts of the point from which the bullet was allegedly fired, its trajectory, and the path it followed through the victim's body. Dr. Smith also testified that it was possible for the bullet to have changed its original path if it first hit something else and then ricocheted. In that event, the bullet's path through the victim's body was conceivable even if the uncontroverted proof established that she was standing upright at the moment of impact.

This Court stressed in Hornsby that

the power to disregard oral testimony because of its inherent lack of believability is one
that should be used sparingly. Only when the testimony is inherently improbable and

impossible of belief should courts intervene to declare it incredible as a matter of law. When the testimony is capable of different interpretations, the matter should be left for the jury to decide as the sole arbiter of credibility.

Id. at 895 (citations omitted). In this case, the proof about the victim's physical position at the moment she was shot is limited to Leland and Bishop's testimony. Given the circumstances surrounding the gunshots, the jury was entitled to interpret this testimony in several different ways, including a way which reconciles the victim's position at the time she was shot with Defendant Lumpkin's position at the time he was firing the gun. The physical facts rule therefore does not entitle this Court to disregard Leland and Bishop's eyewitness identification of Defendant Lumpkin as the shooter in assessing the sufficiency of the evidence. Accordingly, Defendant Lumpkin is not entitled to relief on this issue.

## II. Consecutive Sentencing

These consolidated cases require us to determine primarily whether the trial courts' imposition of consecutive sentences comports with the Sixth Amendment as construed in Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542 U.S. 296 (2004). See Oregon v. Ice, __ S. Ct. __, 76 USLW 3393, 2008 WL 112170 (March 17, 2008) (granting certiorari to consider "[w]hether the Sixth Amendment, as construed in Apprendi . . . and Blakely . . . requires that facts (other than prior convictions) necessary to imposing consecutive sentences be found by the jury or admitted by the defendant"). We review de novo issues of constitutional law. State v. Burns, 205 S.W.3d 412, 414 (Tenn. 2006).

While this is a matter of first impression for this Court,[5] our Court of Criminal Appeals has considered this issue frequently and concluded that Tennessee's method for imposing consecutive sentences passes constitutional muster. See, e.g., State v. Cooper, No. W2005-02481-CCA-R3-CD, 2007 WL 4462991, at *16 n.4 (Tenn. Crim. App. Dec. 20, 2007); State v. Higgins, No. E2006-01552-CCA-R3-CD, 2007 WL 2792938, at *14 (Tenn. Crim. App. Sept. 27, 2007); State v. Bright, No. E2006-01906-CCA-R3-CD, 2007 WL 1259176, at *2 n.1 (Tenn. Crim. App. Apr. 30, 2007); State v. Roberts, No. W2003-02668-CCA-R3-CD, 2004 WL 2715316, at *12 (Tenn. Crim. App. Nov. 23, 2004); State v. Pierce, No. M2003-01924-CCA-R3-CD, 2004 WL 2533794, at *13 (Tenn. Crim. App. Nov. 9, 2004).

### A. Tennessee's Scheme for Consecutive Sentencing

Tennessee's Criminal Sentencing Reform Act of 1989 ("the Sentencing Act") provides as follows:

---

[5]We previously recognized the issue in State v. Robinson, 146 S.W.3d 469, 499 n.14 (Tenn. 2004), but noted that the defendant had not raised the issue in the courts below. In declining to grant relief, this Court simply observed that several other courts had held that Apprendi and Blakely did not apply to consecutive sentences. Id.

(a) If a defendant is convicted of more than one (1) criminal offense, the court shall order sentences to run consecutively or concurrently as provided by the criteria in this section.

(b) The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

(c) The finding concerning the imposition of consecutive or concurrent sentences is appealable by either party.

(d) Sentences shall be ordered to run concurrently, if the criteria noted in subsection (b) are not met, unless consecutive sentences are specifically required by statute or the Tennessee Rules of Criminal Procedure.

Tenn. Code Ann. § 40-35-115 (2006).[6] Additionally, Tennessee Rule of Criminal Procedure 32 provides as follows:

(c) Concurrent or Consecutive Sentences. –

(1) Multiple Sentences from One Trial. – If the defendant pleads guilty or is convicted in one trial of more than one offense, the trial judge shall determine whether the sentences will be served concurrently or consecutively. The order shall specify the reasons for this decision and is reviewable on appeal. Unless it affirmatively appears that the sentences are consecutive, they are deemed to be concurrent.

(2) Prior Sentence Not Fully Served. –

(A) Prior Tennessee Sentence. –

(i) Prior Tennessee Sentence Known. – If the defendant has additional sentences not yet fully served as the result of convictions in the same court or in other courts of Tennessee and if this fact is made known to the court prior to sentencing, the court shall

---

[6]This statute is unchanged from 2003, the year in which Defendant Lumpkin committed his offenses.

recite this fact in the judgment setting sentence, and the sentence imposed is deemed to be concurrent with the prior sentence or sentences, unless it affirmatively appears that the new sentence being imposed is to be served consecutively to the prior sentence or sentences. The judgment to make the sentences consecutive or concurrent shall explicitly relate the judge's reasons and is reviewable on appeal.

(ii) Prior Tennessee Sentence Unknown. – When prior unserved Tennessee sentences are not called to the attention of the trial judge by or on behalf of the defendant at the time of sentencing and are not included in the judgment setting the new sentence, the new sentence is deemed to be consecutive to any such undisclosed prior unserved sentence or sentences.

(iii) Parole Revocation. – The new sentence is consecutive when the defendant is convicted of a misdemeanor while on parole from an undisclosed prior sentence, and the parole is subsequently revoked.

(B) Prior Non-Tennessee Sentence. – If, as the result of conviction in another state or in federal court, the defendant has any additional sentence or portion thereof to serve, the court shall impose a sentence that is consecutive to any such unserved sentence unless the court determines in the exercise of its discretion that good cause exists to run the sentences concurrently and explicitly so orders.

(3) Mandatory Consecutive Sentences. – When a defendant is convicted of multiple offenses from one trial or when the defendant has additional sentences not yet fully served as the result of convictions in the same or other courts and the law requires consecutive sentences, the sentence shall be consecutive whether the judgment explicitly so orders or not. This rule shall apply:

(A) to a sentence for a felony committed while on parole for a felony;

(B) to a sentence for escape or for a felony committed while on escape;

(C) to a sentence for a felony committed while the defendant was released on bail and the defendant is convicted of both offenses; and

(D) for any other ground provided by law.

Thus, a defendant in Tennessee is entitled to concurrent sentences on multiple convictions unless the trial court makes specific factual findings by a preponderance of the evidence after conviction, or consecutive sentences are required by statute or a rule of criminal procedure.

In Defendant Lumpkin's case, the trial court ordered partial consecutive service after finding Lumpkin to be a "dangerous offender." See Tenn. Code Ann. § 40-35-115(b)(4). In Defendant Allen's case, the trial court ordered partial consecutive service after finding Allen to be "an offender whose record of criminal activity is extensive" and a "dangerous offender." Id. § 40-35-115(b)(2), (4). Both Defendants argue that the imposition of consecutive sentences on the basis of these judicially-determined facts violates their federal constitutional rights as explicated in Apprendi and Blakely. The Defendants point to the Supreme Court's statement in Blakely that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment' and the judge exceeds his proper authority." Blakely, 542 U.S. at 304 (citation omitted). The Defendants contend (1) that their effective terms of service, arrived at by adding together their consecutive sentences for separate offenses, is the punishment on which we must focus and (2) that the cumulative punishment they are facing could not have been imposed absent post-

-13-

verdict factual findings by the trial court; ergo, in violation of <u>Blakely's</u> holding. As Defendant Lumpkin's counsel puts it, "[t]he facts necessary to sustain the imposition of consecutive sentencing in this case are not included within the jury's verdict of guilt of the individual offenses." As set forth below, however, we are persuaded that neither <u>Apprendi</u> nor <u>Blakely</u> apply to a trial court's post-verdict findings and decisions about the manner in which a defendant serves his discrete sentences for multiple offenses.

## B.  <u>Jones</u>, <u>Apprendi</u>, and <u>Blakely</u>

We begin our analysis with a brief review of <u>Jones v. United States</u>, 526 U.S. 227 (1999), the case that presaged <u>Apprendi</u>.  <u>Jones</u> addressed whether the federal carjacking statute "defined three distinct offenses or a single crime with a choice of three maximum penalties, two of them dependent on sentencing factors exempt from the requirements of charge and jury verdict." <u>Id.</u> at 229.  The defendant had been charged with carjacking, a crime punishable by up to fifteen years imprisonment, unless serious bodily injury or death resulted, in which case the maximum punishments were twenty-five years and life imprisonment, respectively.  Neither the charging instrument nor the charge to the jury made any mention of the factors necessary for a sentence of more than fifteen years.  The jury convicted the defendant of carjacking.  At sentencing, the presentence report recommended a twenty-five-year sentence because one of the victims had suffered serious bodily injury.  The defendant objected on the grounds that serious bodily injury was an element of the offense and therefore had to be both alleged in the indictment and proved beyond a reasonable doubt to the jury.  The prosecution took the position that serious bodily injury was simply a sentencing factor.  The Court characterized the issue as whether the fact of the victim's bodily injury was "an element of [the] offense rather than a sentencing consideration, given that elements must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." <u>Id.</u> at 232.

The Court agreed with the defendant, stating

under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

<u>Id.</u> at 243 n.6.  The court continued:

The constitutional safeguards that figure in our analysis concern not the identity of the elements defining criminal liability but only the required procedures for finding the facts that determine the maximum permissible punishment; these are the safeguards going to the formality of notice, the identity of the factfinder, and the burden of proof.

<u>Id.</u>  <u>Jones</u> thus stands for the proposition that a jurisdiction may not disguise an element of a particular crime as a post-verdict sentencing factor.

-14-

Apprendi followed. In that case, the defendant pleaded guilty to two counts of second-degree and one count of third-degree unlawful weapons possession. The statutory maximum sentences for these crimes was ten years for the second-degree offenses and five years for the third-degree offense. The prosecution reserved the right to request an "enhanced" sentence for one of the second-degree offenses on the basis that it had been committed with a biased purpose. At sentencing, the trial court imposed a twelve-year sentence for this second-degree offense after finding by a preponderance of the evidence that the defendant had committed the crime "with a purpose to intimidate," triggering the "hate crime" sentencing enhancement statute.

The Supreme Court framed the issue as "whether Apprendi had a constitutional right to have a jury find such bias on the basis of proof beyond a reasonable doubt." 530 U.S. at 475-76. The Court found that he did, holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490.

Significantly as to the issue before us, the Apprendi Court specifically rejected as irrelevant the fact that the defendant could have received the identical actual term of imprisonment had the trial court imposed consecutive sentences on two of the counts. The Court stated: "The constitutional question, however, is whether the 12-year sentence imposed on count 18 was permissible, given that it was above the 10-year maximum for the offense charged in that count. . . . The sentences on counts 3 and 22 have no . . . relevance to our disposition . . . ." Id. at 474. Thus, the Court's focus was on the particular sentence that could be imposed for a particular crime: not the accumulation of sentences imposed for multiple crimes. As noted by the Supreme Court of Maine,

> it appears that the Supreme Court did not intend its holding in Apprendi to be extended outside the narrow issue before it: whether a court has impermissibly exceeded the statutory maximum sentence *for a particular crime* based on factual determinations not submitted to a jury and proved beyond a reasonable doubt.

State v. Keene, 927 A.2d 398, 406 (Me.), cert. denied, 128 S. Ct. 490 (Oct. 29, 2007).

A few years later, the Supreme Court decided Blakely. In that case, the defendant was convicted of a felony under Washington law for which he was subject to a sentence of forty-nine to fifty-three months. The trial court had authority to impose a longer sentence if it found "'substantial and compelling reasons justifying an exceptional sentence.'" 542 U.S. at 299 (quoting Wash. Rev. Code Ann. § 9.94A.120(2) (West 2000)). The trial court increased the defendant's sentence to ninety months after finding that the defendant had committed the offense with deliberate cruelty. Applying the rule of Apprendi, the Supreme Court held unconstitutional the defendant's exceptional sentence. Id. at 305. The Court emphasized that

> the "statutory maximum" for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may

impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

Id. at 303-04 (citations omitted). Like Apprendi, the Blakely decision focused on the constitutionality of the procedure for imposing a particular sentence for a particular crime, not on the aggregate term of imprisonment faced by a defendant convicted of multiple crimes. And, "because the Supreme Court did not address the issue of consecutive sentences in Blakely . . . [Blakely] did nothing to expand the rule of Apprendi, which addressed only sentences for individual crimes." Keene, 927 A.2d at 406.

Both Apprendi and Blakely treated the additional mens rea sentencing factor found by the trial court after conviction as the functional equivalent of an element that transformed the charged offense into a greater crime – thereby requiring that *all* of its elements be put to the jury. See People v. Black, 161 P.3d 1130, 1144 (Calif. 2007), cert. denied 128 S. Ct. 1063 (Jan. 14, 2008). Thus, the common thread running through Jones, Apprendi, and Blakely is a concern with a jurisdiction effectively turning a lesser crime into a greater crime not by adding an element that must be charged and put to the jury, but by allowing a judge to find "sentencing factors" after conviction of the lesser crime. See Apprendi, 530 U.S. at 485 (recognizing that it had earlier "dismissed the possibility that a State could [avoid the due process requirement that it prove every element of a crime beyond a reasonable doubt] merely by 'redefin[ing] the elements that constitute different crimes, characterizing them as factors that bear solely on the extent of punishment'") (quoting Mullaney v. Wilbur, 421 U.S. 684, 698 (1975)). That is, Jones, Apprendi, and Blakely all focus on the constitutional procedural safeguards that must be in place in order to impose punishment for a defendant's conduct in committing any particular crime. It is not constitutionally permissible to charge, try, and convict a defendant for aggravated assault, for instance, and then punish the defendant as if he committed murder on the basis of a post-verdict finding by the trial court that the defendant's victim died during, and as a result of, the assault. See State v. Ice, 170 P.3d 1049, 1062 (Or. 2007) (concluding that "[t]he rule in Apprendi provides a means for determining whether . . . 'sentencing factors' are elements of the offense that the state has to prove beyond a reasonable doubt") (Kistler, J., dissenting).

### C. Application of Apprendi and Blakely to Consecutive Sentences

Defendants in many other states (and in federal courts) have raised Apprendi and Blakely challenges to their consecutive sentences. When considering sentencing schemes that, unlike Tennessee's, do not require judicial fact-finding to rebut a presumption of concurrent sentences, the vast majority of these jurisdictions have rebuffed these challenges. See, e.g., Black, 161 P.3d at 1145 (concluding that "defendant's constitutional right to jury trial was not violated by the trial court's [discretionary] imposition of consecutive sentences"); Hall v. State, 823 So. 2d 757, 764 (Fla. 2002) (affirming discretionary consecutive sentences and holding that "[b]ecause the sentence for each of Hall's offenses did not exceed the statutory maximum, we conclude that Apprendi is inapplicable"); State v. Jacobs, 644 N.W.2d 695, 699 (Iowa 2001) (holding that "Apprendi has no application to the [defendant's consecutive sentences] because all of the sentences imposed on defendant were within the limits of the basic sentencing statutes for those offenses of which he was found guilty [and] [t]he imposition of consecutive sentences did not depend on the finding of a statutorily prescribed fact");

State v. Bramlett, 41 P.3d 796, 797-98 (Kan. 2002) (refusing to apply Apprendi to discretionary consecutive sentences on the basis that it does not address that issue); State v. Abdullah, 878 A.2d 746, 755-57 (N.J. 2005) (holding that, where defendant had no statutory presumption to concurrent sentencing, Apprendi and Blakely are not violated even where common law requires trial court to apply certain criteria when determining whether to impose consecutive sentences); Barrow v. State, 207 S.W.3d 377, 380 (Tex. Crim. App. 2006) (holding that "because culminating individual sentences does not implicate discrete fact finding that affects the 'statutory maximum' punishment, it does not activate the Sixth Amendment right to a jury determination"); Gould v. State, 151 P.3d 261, 268 (Wyo. 2006) (finding Apprendi and Blakely inapplicable to discretionary imposition of consecutive sentences), cert. denied, 128 S. Ct. 125 (Oct. 1, 2007).

The federal courts have likewise refused to apply Apprendi or Blakely to consecutive sentences ordered pursuant to the federal Sentencing Reform Act. See, e.g., United States v. Fifield, 432 F.3d 1056, 1067 (9th Cir. 2005) (holding that, "[b]ecause, under [section] 3584 [of the federal Sentencing Reform Act], a district court need not find any particular fact to impose consecutive sentences, the imposition of [federal sentences] consecutive [to state] sentences does not violate the Sixth Amendment"), cert. denied, 547 U.S. 1122 (May 1, 2006); United States v. Davis, 329 F.3d 1250, 1254 (11th Cir. 2003) (holding that "Apprendi does not prohibit a sentencing court from imposing consecutive sentences on multiple counts of conviction so long as each is within the applicable statutory maximum"), cert. denied, 540 U.S. 925 (Oct. 6, 2003).

More significantly, in those jurisdictions that, like Tennessee, require judicial fact-finding prior to ordering consecutive service, the majority of courts have also rejected Apprendi/Blakely challenges. See, e.g., Vandergriff v. State, 125 P.3d 360, 363 (Alaska Ct. App. 2005) (holding that "when a sentencing judge applying the [common law] rule assesses whether a composite term to serve exceeding the maximum term for the defendant's single most serious crime is necessary to protect the public, the judge is not required to submit this issue to a jury"); People v. Clifton, 69 P.3d 81, 86 (Colo. Ct. App. 2001) (concluding that Apprendi was not violated where the trial court imposed consecutive sentences after finding that both offenses were part of an ongoing transaction because consecutive sentences "did not have the effect of increasing the penalty for the underlying crimes beyond the maximum provided for each offense"), reaff'd in part, 74 P.3d 519, 521 (Colo. Ct. App. 2003); State v. Kahapea, 141 P.3d 440, 452 (Haw. 2006) (deciding to "aphoristically dismiss[] the proposition that either Blakely or Apprendi proscribes consecutive term sentencing"); People v. Wagener, 752 N.E.2d 430, 442 (Ill.) (holding that "[b]ecause consecutive sentences remain discrete, a determination that sentences are to be served consecutively cannot run afoul of Apprendi, which only addresses sentences for individual crimes"), cert. denied, 534 U.S. 1011 (Oct. 29, 2001); Smylie v. State, 823 N.E.2d 679, 686 (Ind.) (holding that "[t]here is no constitutional problem with consecutive sentencing so long as the trial court does not exceed the combined statutory maximums"), cert. denied, 546 U.S. 976 (Oct. 31, 2005); Keene, 927 A.2d at 408 (concluding that "the principles underlying Apprendi do not apply to consecutive sentences because a judge's decision on how two separate sentences for two distinct crimes shall be served is entirely different from the jury's determination of whether the elements of a crime, necessary for a particular sentence for that crime, have been committed"); State v. Senske, 692 N.W.2d 743, 748 (Minn. Ct. App. 2005) (concluding that "unless there is a basis to also require the

jury to determine the permissibility of multiple sentences, we find no grounds on which to apply Blakely to permissive consecutive sentencing").

A few courts, however, have upheld challenges to schemes that allow a trial court to order consecutive service only after making post-verdict factual findings. See State v. Foster, 845 N.E.2d 470, 491 (Ohio) (holding that "because the total punishment increases through consecutive sentences only after judicial findings beyond those determined by a jury or stipulated to by a defendant, [Ohio's consecutive sentencing statute] violates principles announced in Blakely"), cert. denied, 127 S. Ct. 442 (Oct. 16, 2006); Ice, 170 P.3d at 1059 (acknowledging the majority rule that Apprendi and Blakely are inapplicable to consecutive sentencing but "disagree[ing] fundamentally with the proposition that the Apprendi rule is a narrow one" and holding that the trial court's imposition of consecutive sentences based on its own fact-finding was Sixth Amendment error); In re VanDelft, 147 P.3d 573, 579 (Wash. 2006) (holding that, where the defendant had a presumption of concurrent sentences pursuant to the statutory provision under which he was sentenced, the trial court's imposition of consecutive sentences based on judicial fact-finding violated Blakely), cert. denied, 127 S. Ct. 2876 (May 29, 2007); but see State v. Cubias, 120 P.3d 929, 931 (Wash. 2005) (holding that "Apprendi does not have any application to consecutive sentences [and that] to conclude otherwise would extend Apprendi's holding beyond the narrow grounds upon which it rested"). The Ice case, now before the United States Supreme Court, produced a 5-2 decision in the Oregon Supreme Court with the dissenting judges asserting that "[n]either the holding in Apprendi nor its reasoning supports extending that decision to the question of consecutive sentencing," and opining that "the rule in Apprendi serves only to provide a nonsubjective means of determining when the legislature's efforts to redefine the elements of a single offense will stay within constitutional bounds." 170 P.3d at 1059, 1062 (Kistler, J., dissenting).

We are persuaded to join the majority of courts on this issue and hold that Apprendi and Blakely should be construed narrowly such that they do not apply to Tennessee's statutory scheme for imposing consecutive sentences. As recognized by the Illinois Supreme Court, a state court is not "bound to extend the decisions of the [United States Supreme] Court to arenas which it did not purport to address, which indeed it specifically disavowed addressing, in order to find unconstitutional a [state] law." Wagener, 752 N.E.2d at 442 (construing Apprendi). We also agree with the analysis used by the Supreme Court of Maine in Keene in rejecting an Apprendi challenge to consecutive sentences:

> The threshold question is whether the [sentencing] court has impermissibly "increase[d] the penalty for a crime beyond the prescribed statutory maximum" by using factual determinations not found by the jury beyond a reasonable doubt, other than from a prior conviction, a guilty plea, jury verdict, or admission by the defendant. The court's decision to require that separate sentences be served consecutively in no way increases the penalties for the individual crimes.
>
> . . . .
>
> Consecutive sentences are separate punishments for different offenses, and two sentences do not become a single sentence by virtue of their running consecutively.

Thus, the principles underlying Apprendi do not apply to consecutive sentences because a judge's decision on how two separate sentences for two distinct crimes shall be served is entirely different from the jury's determination of whether the elements of a crime, necessary for a particular sentence for that crime, have been committed. Although a defendant has a constitutional right to have a jury determine whether all the elements of a crime have been committed, including those relevant to an elevated sentence, a defendant does not have a constitutional right to serve concurrent sentences for multiple violent offenses.

Keene, 927 A.2d at 407-08 (citations omitted).

### D. Defendants' Consecutive Sentences Do Not Violate Apprendi/Blakely

Prior to ordering consecutive service, the trial court in each of these cases found the Defendant to be a "dangerous offender." That finding required the trial court to analyze whether the Defendant's criminal behavior indicated "little or no regard for human life" and whether he had "no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Additionally, before imposing consecutive sentences on the grounds of dangerous offender status, each trial court had to conclude that the proof also established "that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). None of these findings is in any way a disguised element of any of the crimes committed by these Defendants. (Indeed, Defendant Lumpkin's convictions for premeditated murder, attempted premeditated murder, and aggravated assaults with a deadly weapon clearly suggest a disregard of human life and a lack of hesitation about creating a high risk to human life. The same conclusion applies to the aggravated rapes and aggravated robberies Defendant Allen committed with a deadly weapon.) Rather, these findings were predicated on a judicial assessment of the overall manner and circumstances whereby each Defendant committed the elements of his multiple crimes; a judicial assessment of the wider context of sentences imposed for similar crimes in other cases; and a judicial assessment of each Defendant's likelihood of recidivism. These findings are the types of factors that assist a judge in determining the manner in which a defendant should serve sentences for multiple offenses; they are not the "functional equivalents" of elements a jury considers in determining whether a defendant committed a greater or lesser crime. See Black, 161 P.3d at 1144 ("'Nothing in the high court's decisions in Apprendi [or] Blakely . . . suggests that they apply to factual determinations that do not serve as the 'functional equivalent' of an element of a crime.'" (quoting People v. Black, 113 P.3d 534, 549 (Cal. 2005)). A trial court's determination to impose consecutive sentences on the basis that a defendant is a dangerous offender does not, therefore, raise the Sixth Amendment concerns addressed in Jones, Apprendi, and Blakely. For similar reasons, we hold that the trial court's determination that Defendant Allen is "an offender whose record of criminal activity is extensive," Tenn. Code Ann. § 40-35-115(b)(2), does not raise Sixth Amendment concerns.

The decision whether to impose consecutive sentences for multiple crimes is a decision about the manner in which a defendant serves his or her multiple punishments. Whether or not to "stack" sentences for multiple crimes is therefore akin to a trial court's decision as to how and where a

-19-

defendant serves his sentences: on probation, on community corrections, in split confinement, or in the penitentiary. Apprendi and Blakely simply do not require the jury to determine the manner in which a defendant serves multiple sentences. That Tennessee's statutes require (in most instances) trial courts to make specific factual findings before imposing consecutive sentences does not extend the reach of Apprendi and Blakely. The Defendants' reliance on these cases is therefore misplaced.

Finally, we approve the analysis utilized by our Court of Criminal Appeals on this issue:

> there is no language in Apprendi [or] Blakely . . . that indicates that a defendant's Sixth and Fourteenth Amendment protections extend beyond each individual prosecution in the context of criminal sentencing. . . . [A] trial court's decision whether to impose consecutive sentences does not involve the facts "necessary to constitute a statutory offense" and therefore does not deny the defendant the fundamental rights he is afforded under the Sixth and Fourteenth Amendments. The manner of service of the sentence imposed when a trial court decides whether to impose consecutive sentences - a decision it may make only after the jury has found the defendant guilty of multiple offenses beyond a reasonable doubt - does not usurp the jury's factfinding powers or offend the defendant's due process rights.

Higgins, 2007 WL 2792938, at *14. Accordingly, the Defendants are not entitled to relief on this issue.[7]

## CONCLUSION

The judgments of the Court of Criminal Appeals, affirming Defendant Lumpkin's convictions and sentences and affirming Defendant Allen's sentences, are affirmed. The costs of Defendant Lumpkin's case are taxed to Defendant Lumpkin, for which execution may issue if necessary. The costs of Defendant Allen's case are taxed to Defendant Allen, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE

---

[7]As noted supra, neither Defendant challenges his sentences except upon the federal constitutional issue. We therefore need not conduct a further review of each Defendant's sentences.