IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 21, 2008

## STEVEN CRAIG FULTS v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-60087     Don R. Ash, Judge**

**No. M2007-02570-CCA-R3-PC - Filed January 9, 2009**

The petitioner was found guilty of five counts of rape, all Class B felonies; twelve counts of sexual battery by an authority figure, all Class C felonies; and seven counts of statutory rape, all Class E felonies. He was sentenced to nine years for each Class B felony, three years for each Class C felony, and one year for each Class E felony. His sentences for the Class B felonies were ordered to be served consecutively. His sentences for the Class C felonies were ordered to be served consecutively but concurrently to the Class B felonies. His sentences for the E felonies were ordered to be served consecutively but concurrently to the B felonies, for an effective sentence of forty-five years. In this post-conviction appeal, the petitioner argues that trial counsel was ineffective and that the post-conviction court erred in rejecting the challenge to his sentence because it was previously determined on appeal. After careful review, we affirm the judgment from the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Douglas A. Trant, Knoxville, Tennessee, for the appellant, Steven Craig Fults.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Senior Counsel; and William C. Whitesell, Jr., District Attorney General, for the appellee, State of Tennessee.

## OPINION

The petitioner, a seventh grade teacher, was found guilty of committing numerous sexual acts with the victim over an eighteen-month period. The facts of the case were set forth in the opinion on direct appeal as follows:

The victim in this case, a minor, will be referred to by his initials. M.D. testified that he was born in 1986 and was seventeen years old at the time of the trial.

He attended Barfield Elementary School in Rutherford County, where Defendant taught seventh grade social studies. M.D. said his home room was across from Defendant's classroom, and he saw Defendant every day around the school. Defendant let the students, including M.D., play with his collection of beanie babies and use the computer in his classroom.

M.D. said that he graduated from Barfield Elementary School in May 2000, and entered Riverdale High School in Rutherford County that fall. M.D. said that after he started high school, Defendant contacted him "out of the blue." Defendant asked M.D. if he wanted to work for him as an assistant for the Barfield Elementary School's soccer team, which Defendant coached, and to help Defendant in his classroom. Defendant asked M.D.'s mother, Linda Devine, if her son could work for him, and Ms. Devine agreed. M.D. began working for Defendant two or three times a week, including Saturday when the soccer games were played. Defendant often picked M.D. up at his house when M.D. was scheduled to work for Defendant at the school or at a soccer game. M.D. said Defendant paid him "a lot," sometimes as much as $50.00 to $70.00 for an afternoon of work. M.D. said that he and Defendant spent part of his working time talking about what was going on in M.D.'s life, including M.D.'s feelings about his father and his concerns about fitting into high school. These conversations took place in Defendant's classroom after school was dismissed for the day. M.D. worked for Defendant about one year during which time no inappropriate conduct occurred.

One afternoon after they had attended a soccer game during M.D.'s sophomore year in the fall of 2001, Defendant told M.D. that he needed to drop some equipment off in the classroom. M.D. carried a black bag into the school, and some items in the bag clattered when he set the bag on the floor. M.D. testified that it sounded like video tapes. Defendant asked M.D. to straighten up the classroom. While M.D.'s back was turned, Defendant put a "dirty movie" in the VCR which depicted a man and woman engaging in sexual acts. Defendant asked M.D. what he thought about the movie, and M.D. said that he "started getting really freaked out." Defendant started rubbing M.D.'s back. Defendant touched M.D.'s penis over his clothes and then unzipped his pants and performed fellatio on M.D. M.D. said that he did not do anything to stop Defendant, stating "I didn't know what to do. I just stood there because I didn't know what to think and I was scared." M.D. said that Defendant started moaning "like he really liked it and started calling me, like, going oh baby, and things like that."

M.D. testified:

[Defendant] just told me not to say anything and what it would do to me and people would think about me if they found out that I was doing these kind of things. And how they'd call me gay and [Defendant told] me all the people that he knew and would always tell me like stories about how he could get people in trouble. . . .

-2-

[Defendant] took me home, I didn't talk to my mom, I went in the bathroom, and I threw up and my mom asked me what was wrong, and I just said it [was] something I ate. And I just stood in the shower because I felt dirty. Because that was the first time anything ever happened like that at all. I just stood in the shower and that was it. And I just went to bed because I just felt ashamed and embarrassed.

M.D. said that he trusted Defendant and looked up to him. Defendant told him "all the time" that he would take care of M.D. and that M.D. should look to him as his father because Defendant had never had a son.

On a second occasion in Defendant's classroom, Defendant played a video tape of two men engaging in sexual activities. M.D. turned the recorder off because it "grossed him out." Defendant told M.D., "you know, it's not gay, . . . you need it just when you need it." M. D. did not remember any sexual contact on this occasion.

M.D. said one sexual encounter occurred near Halloween. M.D. said that he was dating a girl from Riverdale High School, and he wanted to buy her a gift for her birthday on November 4, 2001. Defendant told M.D. that he could earn some money by cleaning Defendant's classroom. Defendant stopped M.D. while he was working and performed fellatio on him. Defendant again told M.D. not to tell anyone. Defendant warned M.D. that they "had already done it so who could [M.D.] tell without people thinking that [he] was gay." M.D. said that he was scared "and just whenever [Defendant] pretty much wanted to do it [M.D.] let him." M.D. testified that his reputation was very important to him.

M.D. described three separate occasions which involved Defendant performing fellatio on him in the classroom around the holidays of Valentine's Day, Easter, and Christmas; in the elementary school's locker room; and in Defendant's car in Barfield Park after M.D. got his learner's permit to drive. M.D. said Defendant began coming to his house in the morning after his mother left for work. M.D. described three separate sexual encounters which occurred in his bedroom, in the kitchen, and in the living room. M.D. said that Defendant always touched other parts of his body, such as his legs, buttocks, and chest, while he engaged in oral sex. M.D. said that Defendant performed fellatio on him over one hundred times in Defendant's classroom, and twenty-five to thirty times in M.D.'s house. M.D. said that "[i]t became so often, it was like a routine." M.D. testified that Defendant performed oral sex on him about three times a week from sometime in the fall of 2001 until sometime in early 2003.

M.D. said that he was too embarrassed to tell his mother about the encounters. He acknowledged that Defendant gave him money, clothes, and a phone card. Defendant started doing M.D.'s homework for him. M.D. saved $ 2,000, and Defendant found him a car to purchase.

M.D. said that he finally "forged up enough courage" and told Defendant he "didn't want to do anything" anymore, and Defendant refrained from sexual contact for four or five months. At some point, Defendant told M.D. that he wanted to marry him and take care of him. Defendant said that M.D. "wouldn't have to worry about anything." M.D. told Defendant that he "couldn't see him that way," and Defendant cried.

*State v. Steven Craig Fults*, No. M2004-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 520, at *49 (Tenn. Crim. App. July 7, 2006).

During the post-conviction hearing, the petitioner testified that trial counsel represented him at trial. He said that the trial transcripts were incomplete because they were missing conversation regarding some phone records. The petitioner said that trial counsel subpoenaed the phone records from the victim's mother but she did not bring them to trial on advice of the District Attorney's office. He also says that there was at least thirty minutes of testimony that was not in the transcript from the sentencing hearing.

The petitioner also testified that the victim tried to make contact with him in spite of a no contact order between them. He said that he received a cellular phone call from the victim late one night while he was on his way home from work in Cookeville. The petitioner testified that he had hired a private investigator because the case was not going well and that the victim had threatened both his life and the life of the private investigator. He called 9-1-1 to report that the victim had contacted him and had also notified his parents. He phoned trial counsel at home in the middle of the night to inform him that he had been contacted by the victim, and counsel instructed the petitioner to meet him at his office the following morning and they would go to the Sheriff's Department together. The petitioner said he went to counsel's office the following morning but counsel told him to go to the Sheriff's Department alone . He testified that the Sheriff's Department would not help him.

The petitioner testified that his primary defense to the rape charges was consent. He said that he knew that the victim had been in disciplinary trouble at school regarding homosexual behavior. He said this information came up as a result of a civil suit filed by the victim against Rutherford County Schools and himself. He said that he told counsel about the victim's disciplinary problems prior to trial.

The petitioner said he had character witnesses that he wanted to call on his behalf including two former students: a Tennessee Highway Patrolman and a person serving in Iraq. He testified that he had no prior record before this incident.

Next, trial counsel testified that he represented the petitioner at trial. He recalled the petitioner claiming that the victim had threatened him. He also recalled that he told the petitioner who to contact and discussed venue with him regarding the threats. Counsel said that he would not have used the threats at trial if it had been determined that the victim threatened the petitioner. He

believed that it would have hurt their case because it was the victim's angry reaction to the situation becoming public knowledge. He thought that would hurt their case. Counsel said that he did not recall the petitioner telling him that the victim had been disciplined at school for homosexual acts. He did recall that the petitioner told him the victim had disciplinary problems at school and that those problems led him to allow the victim to do extra studies in his class.

Counsel said that the petitioner hired a private investigator and that the investigator discussed his findings with him. He said the investigator did not provide him with any helpful information because it seemed as though the investigator was working on a different case. Counsel testified that he did not think that would be helpful at trial because the investigator primarily talked to people about actions after the alleged incidents. He said that his defense strategy at trial was that the victim entered into a consensual relationship with the petitioner.

Counsel said that their strategy did not play out at trial like he had anticipated and that they lost the case. He said that their witnesses were not as strong as the State's witnesses and that everything was centered around the testimony of the petitioner. The petitioner decided not to testify after he watched the cross-examination of their two witnesses. It was the petitioner's decision not to testify and in doing so, he did not have the opportunity to discuss some of the issues that he raised in his petition for post-conviction relief. When asked, counsel testified that he argued and litigated to the best of his ability on the consent issue.

During cross-examination, counsel said that he would not present evidence that the petitioner knew about the victim's tendency toward homosexual behavior because he believed it would make the petitioner look like he targeted the victim because of that behavior. He did not believe that the evidence would serve to support that the victim was not forced into having a homosexual act with the petitioner.

Counsel testified that it would have been important to present evidence that the victim and his family were planning a criminal injuries compensation act claim against the petitioner. Counsel also said that he was not aware of any female teachers found guilty of sexual acts with students receiving a sentence similar to the petitioner's sentence. During redirect examination, counsel acknowledged that he did not know the facts of the cases where female teachers were involved with students other than what he had seen or heard in the media. He could not say if they were as egregious as the underlying case or whether they involved homosexual relationships.

At the conclusion of the hearing, the post-conviction court took the matter under advisement and later issued an order denying and dismissing the petition.

Analysis

The petitioner argues that he was sentenced improperly when the trial court imposed consecutive sentences for his Class B felony convictions. The State contends that the issues were

-5-

either previously decided on direct appeal or were waived by the petitioner's failure to raise the issues on appeal. We agree.

In his first issue, the petitioner argues that because his case was in the "pipeline" prior to *Blakely v. Washington*, 524 U.S. 296, 124 S. Ct. 1493 (2004), he is automatically entitled to a remand for re-sentencing. This court's decision on direct appeal addressed the propriety of consecutive sentencing and concluded that the imposition of consecutive sentencing under Tennessee Code Annotated section 40-35-115(b)(5) was appropriate. *State v. Steven Craig Fults*, No. M2004-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 520, at *49 (Tenn. Crim. App. July 7, 2006).

A recent decision of our court contained this note:

> We note that our supreme court's recent decision in *State v. Gomez*, 239 S.W.3d 733, 740 (Tenn. 2007), in which the supreme court determined that the use of enhancement factors not found by a jury or admitted by a defendant violated the Sixth Amendment, does not affect our review of consecutive sentencing issues. Before our supreme court's decision in *Gomez*, it had specifically noted that *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), did not impact Tennessee's consecutive sentencing scheme. *State v. Robinson*, 146 S.W.3d 469, 499 n.14 (Tenn. 2004). In addition, this court has consistently found that *Blakely* does not affect consecutive sentencing determinations. *See State v. Earice Roberts*, No. W2003-02668-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 1049, 2004 WL 2715316, at *15 (Tenn. Crim. App., at Jackson, Nov. 23, 2004), *perm. app. denied* (Tenn. Mar. 21, 2005); *State v. Lawrence Warren Pierce*, No. M2003-01924-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 994, 2004 WL 2533794, at *16 (Tenn. Crim. App., at Nashville, Nov. 9, 2004), *perm. app. denied* (Tenn. Feb. 28, 2005).

*State v. David Harold Hammond*, No. W2007-00219-CCA-R3-CD, 2008 Tenn. Crim. App. LEXIS 100, *9-10, (Tenn. Crim. App. Feb 21, 2008), *perm. app. denied* (Tenn. Aug. 25, 2008). Therefore, because *Blakely* and its progeny do not affect consecutive sentencing, we conclude that the petitioner is not entitled to any relief on this issue. *See State v. Allen*, 259 S.W.3d 671 (Tenn. 2008).

The petitioner also argues that his sentence was "grossly disproportionate" to the point that it constitutes cruel and unusual punishment. The petitioner's entire argument consists of one paragraph:

> There is no question from the Governor's Task Report Force Report introduced by the Petitioner as part of this petition that the average incarceration length for [Class B] felony standard offenders was 108.5 months and for rape of a child, a more serious offense in the instant offenses was 230.4 months. The Petitioner received a grossly disproportionate sentence of 45 years. That sentence, therefore, constitutes cruel and unusual punishment under the Eighth Amendment to

-6-

the United States Constitution and Article One, Section Sixteen of the Tennessee Constitution. *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed.2d 637.

First, we note that the petitioner's citation to *Solem v. Helm* is not pertinent to the case at hand. In *Solem*, the defendant was given a life sentence without the possibility of parole for a bad check felony conviction. The conviction was his seventh felony; however, his prior convictions were for "nonviolent, minor crimes" and the life sentence was found to be disproportionate to the conviction. Here, the defendant's sentence of forty-five years was for repeated sexual offenses committed against the victim over a period of eighteen months, which cannot be contrasted with passing a bad check for $100. The petitioner's argument is merely a conclusion and does not satisfy his burden of proof. Therefore, he is not entitled to relief on this issue.

In his next issue, the petitioner argues that he was denied equal protection because he received a much greater sentence than female teachers have received for having sex with their students. His argument to this issue entirely consists of the following: "Trial counsel admitted on cross examination that female teachers have received far less sentences than the sentence the Petitioner received thereby denying his right to equal protection." His argument contains no citation to authority and no support for his argument. This issue is waived as the petitioner has failed to cite authority to support his argument. Tenn. Ct. Crim. App. R. 10(b); *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).

Next, the petitioner alleges four specific instances of ineffective assistance of counsel: 1) Counsel was ineffective for failing to present evidence that the victim contacted him by telephone after a "No Contact" order was issued; 2) Counsel was ineffective for failing to impeach the victim with evidence that he planned to file a civil lawsuit against the petitioner; 3) Counsel was ineffective for not producing enough character witnesses on his behalf; and 4) Counsel was ineffective for failing to introduce the petitioner's school disciplinary records, which dealt with his reprimands for homosexual behavior.

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminally accused the right to representation by counsel. Additionally, both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation encompasses the right to "reasonably effective" assistance, that is assistance "within the range of competence demanded of attorneys in criminal cases." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052 (1984); *see Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975).

A claim of ineffective assistance of counsel is a claim cognizable under Tennessee's Post-Conviction Act. *See* Tenn. Code Ann. §§ 40-30-101 to -313. The petitioner has the burden in a petition for post-conviction relief to prove the allegations of fact by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). In order to be successful on a claim of ineffective assistance of counsel, the petitioner must establish that counsel's performance was deficient and that the deficient performance resulted in prejudice to the petitioner. *Strickland*, 466 U.S. at 687; *Baxter*, 523 S.W.2d

at 936. To prove deficient performance, the petitioner must demonstrate that counsel's conduct fell below an objective standard of "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.

To prove that counsel's deficient performance prejudiced the defense, the petitioner "must establish a reasonable probability that but for counsel's errors the results of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Here, the petitioner contends that counsel was ineffective in four areas. He raises two issues concerning counsel not introducing specific evidence. He first contends that trial counsel was ineffective for not bringing a threat by the victim to the attention of the trial court, and second, he contends counsel should have impeached the victim with evidence that he planned to initiate a civil lawsuit. He also argues that counsel was ineffective for not investigating the threat made by the victim. However, he does not provide any evidence of how he was prejudiced by trial counsel's strategy. As previously stated, in order to succeed in a post-conviction petition, the petitioner must prove both that counsel's performance was deficient and that the deficient performance resulted in prejudice to the petitioner. The petitioner is essentially arguing that counsel's strategy was ineffective. However, the petitioner is not entitled to the benefit of hindsight and may not second-guess a reasonably based trial strategy by counsel. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994) (citing *State v. Martin*, 627 S.W.2d 139, 142 (Tenn. Crim. App. 1981). Further, the petitioner has not established any resultant prejudice from trial counsel's strategy and, therefore, is not entitled to relief on this issue.

Next, the petitioner argues that counsel was ineffective for failing to produce character witnesses on his behalf. His entire argument consists of the following:

> The Petitioner has no criminal record prior to these events and certainly enjoyed reputation of good character in the community. His trial counsel was ineffective for not producing said witnesses to testify about his good character. He was certainly prejudiced by the failure to call those witnesses because good character in itself can create reasonable doubt.

Again, the petitioner's argument contains no citation to authority and no support for his argument. This issue is waived. Tenn. Ct. Crim. App. R. 10(b); *State v. Schaller*, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).

In his final issue, the petitioner argues that counsel was ineffective for failing to introduce the victim's school disciplinary records dealing with sexual misconduct relating to homosexuality. The petitioner argues that because the defense was consent to the sexual conduct that records pertaining to the victim's own homosexuality, occurring two years prior to the petitioner's conduct, should have been presented. Trial counsel testified that he was not aware that the victim had been in trouble at school for homosexual behavior. He also said that he would not have used the

information at trial because it could have depicted the petitioner as a predator who picked the victim as his target because of the petitioner's knowledge that the victim had engaged in homosexual activity. Again, this is an issue of trial strategy that appears reasonably based. The fact that a particular strategy or tactic hurt the defense does not, alone, support a claim of ineffective assistance. *See Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Here, the petitioner has not demonstrated that the failure to introduce this evidence resulted in prejudice. Therefore, we affirm the judgment from the post-conviction court.

Conclusion

Based on the foregoing and the record as a whole, we conclude that the petitioner is not entitled to relief and, accordingly, affirm the judgment from the post-conviction court.

_____
JOHN EVERETT WILLIAMS, JUDGE