# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 19, 2009 Session

## STATE OF TENNESSEE v. ISRAEL DEAN BOLINGER

**Direct Appeal from the Criminal Court for Greene County**
**No. 06-CR-338     John F. Dugger, Jr., Judge**

---

**No. E2008-01576-CCA-R3-CD - Filed June 15, 2010**

---

The appellant, Israel Dean Bolinger, was indicted by the Greene County Grand Jury on one count of aggravated robbery. He was convicted of the lesser-included offense of facilitation of aggravated robbery and was sentenced to five years in prison. On appeal, he contends the trial court erred in denying his motion for acquittal, failing to apply the physical facts rule, denying certain redactions in a statement, and in determining his sentence. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Frances X. Santore, Jr., Greeneville, Tennessee, for the appellant, Israel Dean Bolinger.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and J. Chalmers Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In the early morning hours of October 16, 2006, a man wearing a gray hoodie entered the Quick Stop #8 in Greeneville, Tennessee; held the clerk at knife point; took a little more than $300 from the cash register; and left. As Greeneville police were responding to the clerk's call for help, Officer David White stopped a car heading away from the store. The car was driven by Geneva Cooter and had two passengers: the appellant was in the front seat and Matthew Waddell was in the back seat. Officer White asked Mr. Waddell to step out of

the car.  He complied but then attacked Officer White.  A fight ensued, and Ms. Cooter sped away with the appellant in the car.  Officer White eventually subdued Mr. Waddell.  Two days later, police located Ms. Cooter and were then led to the appellant, who was found hiding in a nearby apartment and carrying a knife.

Mr. Waddell pled guilty to the robbery.  He also pled guilty to a second robbery that occurred a few hours before the Quick Stop holdup.  Ms. Cooter likewise pled guilty to charges related to the robberies.  Mr. Waddell claimed that he acted alone and did not tell his companions that he was robbing the stores; however, Ms. Cooter said all three were involved in the robberies.

The appellant was charged in both robberies.  In a separate trial, a jury acquitted him on the charges related to the first offense.  He was tried and convicted of the Quick Stop robbery but that conviction was reversed, and the case was remanded for a new trial.

At the retrial, the State called four witnesses in its case-in-chief: Sheila Fulton, Officer White, Officer Kenny Carter, and Detective Stuart Kilgore.  Ms. Fulton was the only employee on duty at the Quick Stop when the robbery occurred.  She testified that the appellant entered the store wearing a gray, zipped-up hoodie. He walked behind the counter, pulled out a knife, and demanded money.  Ms. Fulton was afraid that the appellant was going to kill her, and he threatened to do so.  She opened the register, and he took a little more than $300 in cash.  The appellant prevented Ms. Fulton from setting off the alarm.  After the appellant grabbed the money, he ran out the front door and around to the back of the store.

Ms. Fulton testified that she got a good look at the appellant's face, which she said she would never forget.  In court, she identified the appellant as the perpetrator.  She also identified the appellant when the police presented her with a photo line-up a few weeks after the robbery.  Further, Ms. Fulton noted that she was familiar with Mr. Waddell from his previous trips to the store and that he was not the robber.

Ms. Fulton provided a detailed description of the robbery to the police and gave two separate descriptions of the perpetrator.  She described him in her first statement as a young white male wearing a gray sweat jacket with a hood pulled tight around his face.  He was wearing blue jeans and tennis shoes.  She said he was approximately five-feet, four inches tall and had a sandy blonde mustache.  In her second statement, she added that she thought he was in his mid-20s; he had an almond shaped face and short, dirty fingers with grease under the nails; he was wearing an orange shirt underneath the hoodie; and he weighed between 125 and 140 pounds.

Ms. Fulton said that there was no car in front of the store at the time of the robbery. She explained that the Quick Stop did not have a parking lot but that it did have a driveway that circled around it. The only windows in the store face the front, so she could not see anything behind the store or to its sides.

During Ms. Fulton's examination, she was asked to review security camera footage from the robbery. While viewing the video, she specifically noted the presence of a second person "that brought [the hooded robber] when he first came in the store." She testified that the second man "walked off."[1]

Ms. Fulton said that the robbery took a heavy psychological toll on her. For a long time she was afraid to go outside of her house alone. She had also been unable to work alone since the robbery.

Ms. Fulton conceded that parts of her statements to the police immediately after the robbery could not be verified by the security camera footage. For instance, she told police that the robber put the knife in her stomach, but the video showed that he was at her side. She acknowledged that he did not reach around her to put the knife in her stomach. She also told police that the robber pushed her into the cash register. Again, that was not depicted in the video.[2] Ms. Fulton said that she was six-feet tall, and she described the robber as five-feet, four inches tall and much shorter than she. She acknowledged that the appellant was six-feet, one inch tall and that Mr. Waddell was five-feet, ten inches tall. She said that her estimate of the robber's height was not based on the measuring tape at the front door of the store and that she did not recall seeing such a tape. Lastly, in court she described the appellant's fingers as long, but she told the police that her assailant had short fingers.

Officer White also testified at trial. Officer White responded to the armed robbery at the Quick Stop. On his way to the store, he encountered Ms. Cooter's car coming from the direction of the Quick Stop. He pulled in front of her and noted that the car had three individuals in it. He approached the passenger side and recognized Mr. Waddell in the back seat. Officer White asked Mr. Waddell to get out of the car, which he did. After stepping out of the car, Mr. Waddell began to struggle with Officer White. About a half-minute later,

_____

[1] After a thorough review of the security camera footage contained in Exhibit 7 in the record, this court is unable to locate the second individual to whom Ms. Fulton was referring. Further, neither party mentioned Ms. Fulton's comments regarding the second person. Nevertheless, her testimony speaks for itself.

[2] It should be noted, however, that the video does not provide a linear sequence of events; it jumps around between times and camera angles.

Ms. Cooter sped away. The struggle with Mr. Waddell continued, but Officer White eventually pepper sprayed him into submission.

The video recorder in Officer White's cruiser was on during the stop. The video showed Ms. Cooter's car only at the very beginning of the stop. Officer White pulled around Ms. Cooter's car after stopping her and the remainder of the video showed the wall of a nearby building. Nevertheless, from the dashboard video Officer White was able to positively identify the appellant as the man in the front passenger seat of Ms. Cooter's car.

The day after the robbery, Officer White learned that Ms. Cooter was the driver of the car and that she could likely be found at a residence on Locust Street. He and Officer Carter went to the house and found Ms. Cooter as well as her car. Based on information they obtained while at the Locust residence, Officer Carter located the appellant. Officer Carter turned the appellant over to Officer White along with a knife Officer Carter found on the appellant.

After Officer White, the State called Officer Carter to testify. Officer Carter noted that he was on an unrelated traffic stop when he was notified of the robbery at the Quick Stop. He stayed at the traffic stop until he learned that Officer White had stopped Ms. Cooter's car and was in a fight. Officer Carter proceeded to the site to assist Officer White and helped him subdue Mr. Waddell. After restraining Mr. Waddell, Officer Carter searched him and did not find any weapons.

The next day, Officer Carter helped Officer White search for Ms. Cooter. They found her at an apartment, and, as Officer Carter was leaving, he saw a crowd in front of the residence. One of the people in the crowd directed him to another residence, where he located the appellant hiding behind some boxes. Officer Carter found a "yellowish" pocket knife with two blades on the appellant.

Finally, the State called Detective Kilgore. He was the detective in charge of the investigation of the Quick Stop robbery. Detective Kilgore testified that he met with Ms. Fulton shortly after the robbery, but she was too upset to be interviewed. He also testified as to the limits of his investigation. He said that he did not sweep the Quick Stop or the cash register for fingerprints. Also, he did not search for the knife Ms. Fulton said the robber used.

Detective Kilgore testified about his meetings with the appellant and, in particular, a statement the appellant gave to him during his interview. Detective Kilgore read the statement to the jury; however, the court did not permit the jury to see it.

Detective Kilgore testified that after he read the appellant his <u>Miranda</u> rights, the appellant agreed to talk with him. The appellant said he borrowed Ms. Cooter's car on October 15, the day before the Quick Stop robbery. Mr. Waddell, who the appellant said was not a good friend, came to his house that day and wanted to drive around because he had nothing to do. The appellant told Mr. Waddell that the appellant needed to take the car back to Ms. Cooter, so the two went to the home of Ms. Cooter's friend, Greg Shaw, where they found her. Ms. Cooter, Mr. Waddell, the appellant, and another girl drove around for a while and then returned to Mr. Shaw's home. While driving around, the appellant was drinking and taking Valium pills. Around 9:00 p.m., Ms. Cooter, Mr. Waddell, and the appellant went to a convenience store to buy some beer. While they were driving around, Mr. Waddell tried to think of ways to get money. He mentioned that he knew a girl at a store, so the three went to a trailer park near the store. Afterward, the appellant took Mr. Waddell to get some drugs, and they returned to Mr. Shaw's house. They left again around 1:45 or 2:00 a.m. The appellant said he was just riding around and drinking beer. Ms. Cooter stopped near the Quick Stop and let Mr. Waddell out of the car. The appellant and Ms. Cooter waited for him to return. When Mr. Waddell returned, they drove away but were soon stopped by an officer. The officer asked Mr. Waddell to get out of the car, and he complied. The appellant and Ms. Cooter left the scene and drove to Mr. Shaw's home.

Detective Kilgore testified that during the interview, but after the appellant gave his statement, the appellant told him that he wanted to speak to an attorney. Detective Kilgore stood up and began to leave. As Detective Kilgore was leaving, he asked the appellant if he was wearing a gray hoodie on the night of the robbery. The appellant told him "that he did not have a gray hoodie and he, the night of the robbery, was wearing an orange shirt."[3] The State rested its case at the conclusion of Detective Kilgore's testimony.

The appellant called two witnesses: Mr. Waddell and Daniel Buchanan, Jr., whom the defense offered as an expert on security camera systems. Mr. Waddell testified that he was serving sentences for the two robberies. He said that he alone was responsible for the Quick Stop robbery as well as the first robbery earlier that night. Indeed, near the beginning of Mr. Waddell's direct examination, he volunteered the following: "Why is two people on trial for the same robbery? I done pled out to two robberies. Why am I here testifying when another–on a different case, when I committed two robberies? If I didn't do the two robberies, I wouldn't have pled out to them."

---

[3] Although the appellant's statement was made in response to a question Detective Kilgore posed after the appellant invoked his right to counsel, his testimony and the exhibit were admitted without objection.

Mr. Waddell testified that he committed the robbery with a knife and that he threw the knife away sometime later. During cross-examination, he described the knife as small and orange. He also said that he had two knives, one for each robbery. He testified that he entered the store, walked behind the counter, and demanded the money. He kept the knife in his pocket the entire time. Mr. Waddell also testified that he wore one hoodie in the first robbery, then discarded it and put on another hoodie for the second robbery. He did not remember the colors of the hoodies, but he listed a variety of colors they could have been.

Mr. Waddell said that Ms. Cooter drove him to and from the robberies. The appellant, whom Mr. Waddell met a couple of days before the robberies, was also in the car. Neither the appellant nor Ms. Cooter were aware that Mr. Waddell robbed the stores because he told them that he was going to borrow some money. Mr. Waddell testified that the appellant and Ms. Cooter waited in a car in a trailer park behind the Quick Stop while he committed each robbery. After the second robbery, the three left in Ms. Cooter's car and were quickly stopped by the police. Mr. Waddell got out of the car, and Ms. Cooter and the appellant drove off.

Mr. Waddell explained that he used the money from the first robbery to buy crack cocaine, which he smoked between the robberies. Mr. Waddell said he smoked crack cocaine twenty times between the two robberies. However, when questioned about the number on cross-examination, Mr. Waddell replied, "[y]ou wanted a number; I gave you one."

Mr. Waddell said that when he was interrogated by Detective Kilgore, he confessed to the two robberies. He explained that he did not implicate anyone else because he was not "going to rat on anybody."

Mr. Waddell acknowledged that he had previously been arrested on charges of attempting to file a false report, theft under $500, theft over $500, aggravated robbery, and resisting arrest.

The defense then called Mr. Buchanan. Mr. Buchanan testified that he worked in the computer engineering, information technology, and broadcast engineering fields. He said he was 29 years old and had worked for Digital International, a maker of security systems for storage facilities, for two years. Mr. Buchanan was the head of Digital International's IT department. At the time of trial, he worked on broadcast automation systems for radio stations and installed audio/video and security camera systems. He said that defense counsel had hired him to do broadcast automation work in exchange for free legal services. Mr. Buchanan said that he had no formal education in the area and that his expertise was largely

self-taught. The trial court accepted Mr. Buchanan as an expert for the purposes of analyzing security camera systems.

Mr. Buchanan provided detailed testimony about the analysis he conducted on the Quick Stop's security system. His analysis primarily involved taking measurements of distances and estimating the angles at which the Quick Stop's security cameras were set. In particular, he noted that the measuring strip affixed to the wall near the Quick Stop's entrance was approximately three inches shorter than the heights it purported to measure. For example, the line on the tape denoting six feet was in reality five-feet, nine inches from the ground. He noted that the security camera behind the counter was mounted to be essentially level, and it was set at a height of five and one-half feet above the ground. He also took a series of measurements of the appellant and analyzed the security camera footage from the night of the robbery. He explained that the footage was out of sequence, often duplicated itself, and was of "poor quality."

Mr. Buchanan testified that based on his analysis of the evidence, the hooded man shown in the security camera video was "several inches" shorter than Ms. Fulton. Because the appellant is slightly taller than Ms. Fulton and because of the poor quality of the video, Mr. Buchanan concluded that the appellant was not the hooded man. The defense rested its case after Mr. Buchanan's testimony.

Over defense objections, the State called Ms. Cooter as a rebuttal witness. Ms. Cooter, like Mr. Waddell, was also serving a sentence resulting from a plea to charges related to the robberies. Ms. Cooter testified that all three individuals were smoking crack cocaine that night. She also testified that the appellant and Mr. Waddell specifically talked about robbing a store. She said she drove the appellant and Mr. Waddell to the Quick Stop and parked behind the store. She testified that both men got out of the car and that they both robbed the store. When they returned, Mr. Waddell placed the money in the seat pocket behind the front passenger seat. The police stopped them shortly thereafter. When Mr. Waddell got out of the car and started fighting with Officer White, Ms. Cooter and the appellant drove away. They went to Mr. Shaw's house, and the appellant got the money out of the passenger seat pocket. Ms. Cooter also testified that the appellant had a yellow pocket knife with him at the time.

Ms. Cooter said that she and the appellant were arrested the next day. Ms. Cooter gave a statement to Detective Kilgore, but she acknowledged at trial that she did not mention that she had smoked crack cocaine or that the appellant had a weapon on him when they drove away from Officer White. In addition, Ms. Cooter admitted that she had spoken to Detective Kilgore and the prosecuting attorney prior to her testimony at trial and that they might assist her when she became eligible for parole. Nevertheless, Ms. Cooter denied that

her testimony was driven solely by self-serving motivations. Instead, she explained that she was serving time for her role in the robberies and that she felt the appellant should do likewise.

The jury found the appellant not guilty of aggravated robbery but guilty of the lesser-included offense of facilitation of aggravated robbery.

The trial court sentenced the appellant as a Range I offender to five years in prison. The trial court found that no mitigating factors applied, but it applied several enhancement factors under Tennessee Code Annotated section 40-35-114. Specifically, the court placed heavy weight upon the appellant's criminal history. See Tenn. Code Ann. § 40-35-114(1). It also noted that there was more than one victim, noting the loss to the store as well as the trauma to Ms. Fulton. See id. at (3). It further applied an enhancement factor for the personal injury inflicted on Ms. Fulton pursuant to section 114(6), and it found that the appellant had no hesitation about committing a crime when the risk to human life was high under section 114(10).

On appeal, the appellant claims that the trial court erred in failing to apply the physical facts rule to exclude testimony of both Ms. Fulton and Ms. Cooter, that the evidence was insufficient, and that the trial court committed reversible error by not redacting prejudicial evidence from his statement to Detective Kilgore. Finally, he asserts the trial court erred in rendering his sentence.

## II. Analysis

### A. Application Of The Physical Facts Rule

First, the appellant contends that the trial court erred by declining to apply the physical facts rule to prohibit the jury from considering certain testimony. He argues that application of the physical facts rule necessitates an acquittal based on the sufficiency of the evidence.

Our supreme court has described the physical facts rule as:

the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded. That is, where the testimony of a witness cannot possibly be true, is inherently unbelievable, or is opposed to natural laws, courts can declare the testimony incredible as a matter of law and decline to consider it. . . . [W]here undisputed physical facts are entirely inconsistent with and opposed to testimony the physical facts must control. No jury can be allowed to return a

-8-

verdict based upon oral testimony which is flatly opposed to physical facts, the existence of which is incontrovertibly established. Courts have made it clear that in order for testimony to be considered incredible as a matter of law, it must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature. Thus, for example, if a witness was to testify that he saw the sun set in the east, the court would be free to declare such testimony incredible as a matter of law and disregard it.

State v. Allen, 259 S.W.3d 671, 679-80 (Tenn. 2008) (quotation marks, citations, ellipses, and brackets omitted). The rule can apply to criminal cases. See State v. Hornsby, 858 S.W.2d 892, 895 (Tenn. 1993). However, it is available "only where the physical facts at issue are well-established and universally recognized physical laws." Allen, 259 S.W.3d at 680 (quotation marks omitted). It "may not be invoked where its application depends upon assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of objects." Id. (quotation marks and brackets omitted). Nor should it be used to disregard testimony that is capable of different interpretations because the jury is responsible for weighing the evidence. See id. at 681. Thus, our supreme court has instructed that the rule be used only "sparingly." Hornsby, 858 S.W.2d at 895.

The appellant claims that the trial court should have applied the rule because, although Ms. Fulton positively identified the appellant as the robber, she is six-feet tall and described the robber as five-feet, four inches tall; weighing 130 pounds; and having short fingers. He asserts that the evidence showed that the appellant is six-feet, one inch tall; weighs more than 130 pounds; has long fingers; and the security camera video confirms that the robber was shorter than Ms. Fulton. Moreover, although Ms. Fulton testified that there was only one robber and the security camera supports her testimony, Ms. Cooter testified that both the appellant and Mr. Waddell robbed the store.

We begin with Ms. Fulton's testimony. First, the purported "physical facts" at issue here are actually measurements and estimates, such as Ms. Fulton's testimony regarding her assailant's height, weight, and finger length. The rule is not to be used for such estimates. See Allen, 259 S.W.3d at 680. Indeed, these are precisely the type of statements that are capable of different interpretations and therefore necessitate a jury's evaluation. Second, it is not clear which statements the appellant contends are inconsistent and should be stricken. Ms. Fulton's positive identification of the appellant in the photograph line-up and at trial are separate and distinct from her description of the robber's physical appearance. Only Ms. Fulton's description of the robber's height and weight are even arguably in conflict with the proposed "physical facts" (the appellant's actual height and weight and the security camera's depiction of the robber).

The appellant's argument with respect to Ms. Cooter's testimony fares no better. The appellant claims Ms. Cooter's testimony should be disregarded because she was the only person who testified that there were two robbers and the security camera video shows only one. First, the record reflects that Ms. Fulton noted the presence of a second individual in her narration of the video at trial. Second, the video footage was from stationary cameras that did not cover the entire store and does not provide the type of undeniable physical fact necessary to apply the rule. Finally, Ms. Cooter did not see the robbery. Her testimony that "they" robbed the store while she was in the car behind the store is susceptible to a variety of interpretations, such as one of them went in and one stood guard out front. That is something the jury needed to sort out.

## B. Sufficiency Of The Evidence

The appellant next challenges the sufficiency of the evidence. On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). He must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999); State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). Moreover, while a guilty verdict may result from purely circumstantial evidence, in order to sustain the conviction the facts and circumstances of the offense "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the [appellant]." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

We conclude there was sufficient evidence for the jury to convict the appellant of the lesser-included offense of facilitation. In order to convict the appellant of facilitation, the jury was required to find that he, "knowing that another intends to commit a specific felony . . . knowingly furnishe[d] substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). The evidence must establish that the appellant was aware that

the other person was going to commit a specified felony.  See State v. Parker, 932 S.W.2d 945, 950-51 (Tenn. Crim. App. 1996).  Here, that felony is aggravated robbery.

The jury heard evidence from Ms. Cooter that the appellant knew Mr. Waddell intended to rob the Quick Stop.  They discussed it beforehand.  Ms. Cooter also testified that both Mr. Waddell and the appellant got out of her car and together robbed the store.  She further testified that the appellant took the money from the robbery after they reached Mr. Shaw's house.  In addition, Ms. Fulton referred to both the robber and a second man who "brought" him.  The jury could infer that the appellant stood guard or otherwise assisted in the robbery.  Moreover, the officers' testimony of Ms. Cooter and the appellant fleeing from Officer White and the appellant later being found hiding and carrying a knife provide additional circumstantial evidence of the appellant's guilt.

The bulk of the appellant's argument centers on the credibility of the witnesses and the trial court's failure to apply the physical facts rule.  We have already addressed the physical facts rule, and our sufficiency review does not permit us to question the jury's evaluation of the relative credibility of the testimony.  The jury heard the conflicts in the testimony.  It clearly credited Ms. Cooter's version and discredited Mr. Waddell's.  We will not second-guess that decision.

## C. The Trial Court's Redaction Of The Appellant's Statement

The appellant next contends the trial court should have granted his motion for judgment of acquittal because it impermissibly allowed evidence of a prior bad act under Tennessee Rule of Evidence 404(b).  The admissibility of Rule 404(b) evidence lies within the sound discretion of the trial court, and an appellate court will not interfere with the lower court's exercise of that discretion absent a clear showing of abuse.  See State v. Gilley, 297 S.W.3d 739, 758 (Tenn. Crim. App. 2008).  But the trial court's discretion in determining the admissibility of evidence is generally circumscribed by the Tennessee Rules of Evidence.

The statement at issue is the following:

Matt was trying to think of a way to come up with some money.  Geneva ran into some guy at the Phillips 66 she knew and talked to him for a while.  Matt said he knew a girl who worked at the store at Be[r]nard & Church so we went to the trailer park on Bernard behind Lighthouse Church which is across from the store.  *Geneva went to one of the trailers and I stayed in the car listening to the radio and Matt went to the store.  Geneva and Matt were not gone long until they both came back and got in the car.  We had some money Matt had got at the store so* <u>I took him to buy some drugs</u>.  We went back to Greg's.

(Emphasis added).[4]

Before Detective Kilgore read the statement the appellant gave during his interview, defense counsel objected, and the court heard argument about whether the statement needed to be redacted. The defense argued that the statement contained a reference to the first robbery, for which the appellant was acquitted, and would unfairly suggest to the jury that the appellant was a participant. The trial court initially agreed to redact the entire portion to which the appellant objected. However, the State suggested a more limited redaction, and the court ultimately agreed to the State's position.

The appellant argues that the line, "I took him to buy some drugs" should have been redacted because it referred to a robbery for which he was acquitted. He claims the statement is both irrelevant and violates Rule 404(b). Neither argument is persuasive.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

The trial court did not abuse its discretion in finding the statement in question to be relevant because it provides a motivation for the robbery.

In addition, the trial court did not abuse its discretion with respect to Rule 404(b). In part, the appellant's argument is that the statement too strongly references the first robbery. Because the appellant was acquitted of that robbery, he reasons, the statement's reference to buying drugs comes too close to suggesting to the jury that he was involved in the first robbery. In addition, the appellant asserts the trial court failed to follow the procedures prescribed by Rule 404(b) for the admission of evidence of prior bad acts. The first line of attack fails because the statement that was actually read to the jury does not reference the prior robbery. It simply says that Mr. Waddell wanted to get some money, he knew a girl who worked at the store, and after acquiring the money they went to buy drugs. In our view, the statement does not allude to the first robbery.

---

[4] The italicized language (we supplied the italics) is the text the trial court redacted. The underlined portion (again, we supplied the underline) is the text the appellant says should have been redacted, and the trial court initially concluded it would redact, but was read to the jury.

The second part of the appellant's challenge is similarly unavailing. The appellant did not object at trial to the reference to drug use. Instead, his exclusive concern was the statement's potential suggestion that the appellant was involved in the first robbery. The issue was first raised on appeal and is thus waived. See State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995).

## D. Sentencing

Finally, the appellant argues the trial court erred in arriving at his sentence. Appellate review of the length, range, or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210, see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

We see no reversible error. The trial court's application of the enhancement factors is proper, save one. The trial court applied Tennessee Code Annotated section 40-35-114(10) because the presence of the knife during the robbery could have caused serious bodily injury. But, as the State points out, the presence of the knife was a necessary element of the underlying aggravated felony, so it is not an appropriate enhancement. See State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1998). However, that error does not change the outcome. The trial court's primary concern in the application of the enhancement factors in this case was with the appellant's extensive criminal record and, in particular, convictions for offenses committed after the instant offense but before sentencing. The application of enhancement factor (1) was appropriate. In addition, enhancement factor (3) also applies. Both the Quick Stop and Ms. Fulton were named as victims in the indictment, and the evidence demonstrated that both were victims of the crime. See State v. Raines, 882 S.W.2d 376, 384 (Tenn. Crim. App. 1994) (holding that a victim under enhancement factor (3) is "a person or entity that is injured, killed, had property stolen, or had property destroyed by the

perpetrator of the crime"). The record also supports the trial court's application of enhancement factor (6) because of the emotional trauma inflicted upon Ms. Fulton.

We do not agree with the appellant's contention that the trial court erred with respect to its mitigation findings. Mitigating factor (1) (that the appellant's conduct neither caused nor threatened serious bodily injury) does not apply because the evidence demonstrates that the appellant facilitated the robbery of a store at knife point. Whether he held the knife or not, his participation assisted the robber and thus threatened serious bodily harm. Mitigating factor (4) (that the appellant played a minor role in the commission of the offense) does not apply because the evidence suggests the appellant was heavily involved in the robbery. A facilitator can still be something other than a minor party to a crime, see, e.g., State v. Parker, 932 S.W.2d 945, 956 (Tenn. Crim. App. 1996), and the evidence in this case demonstrates that the appellant did more than simply share in the proceeds after the fact. Rather, the evidence shows he (a) discussed the robbery with Mr. Waddell in advance; (b) got out of the car to assist him; (c) walked with him to the door of the store; and (d) may have provided the weapon. Finally, while mitigating factor (13) might apply as the appellant suggests, the trial court considered the items the appellant presented and gave them the weight it deemed appropriate.

The trial court properly applied the enhancing and mitigating factors as well as the principles and goals of the sentencing statute. We therefore find no reversible error in the trial court's sentence.

### III. Conclusion

For the reasons detailed above, we affirm the judgment of the trial court.


_____
NORMA McGEE OGLE, JUDGE

-14-