IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 4, 2010

## ERIC P. LUMPKIN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 03-08391     James C. Beasley, Jr., Judge**

_____

**No. W2009-01738-CCA-R3-PC  - Filed June 18, 2010**

_____

The petitioner, Eric P. Lumpkin, appeals the post-conviction court's denial of his petition for post-conviction relief. He argues that the post-conviction court erred in finding that he received the effective assistance of appellate counsel. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and D. KELLY THOMAS, JR., JJ., joined.

Neil Umsted, Memphis, Tennessee, for the appellant, Eric P. Lumpkin.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Greg Gilbert, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The facts of the case were related by the Tennessee Supreme Court on discretionary review as follows:

A jury convicted [the petitioner] of one count of first degree premeditated murder; one count of attempted premeditated murder; and two counts of aggravated assault. A summary of the proof adduced at trial follows.

Leland and Bishop Tatum[1] lived in the adjoining halves of a duplex at 895 Speed Street in Memphis, Tennessee. This duplex was located above street level and had a front porch with twelve steps leading down to the street level. Each side of the duplex had a door opening onto the front porch. Across the street lived Jerry Lumpkin, [the petitioner]'s father. Jerry's residence also sat above street level and also had a front porch with several steps leading down to street level. Next door to Jerry lived Leland and Bishop's mother, Emma Tatum. Some years prior to the events giving rise to this trial, Bishop Tatum and Jerry Lumpkin quarreled. The feud had not been abandoned.

On the evening of July 19, 2003, Leland and Bishop Tatum were conversing on their front porch. A short time earlier, [the petitioner] had asked Leland if Leland knew where to obtain some "dope" for [the petitioner] to smoke. Leland ignored this query. While Leland and Bishop were on their porch, [the petitioner] was across the street on his father's porch. Leland testified that [the petitioner] called out and told Leland to "ask [Bishop] to come down the steps so [they] can fight." Leland and Bishop ignored him. [The petitioner] repeated his challenge, adding "because I don't like him and never have." The two men again ignored the taunts. [The petitioner] then walked across the street and began walking up the porch steps to where Leland and Bishop were standing. When [the petitioner] reached the second step, Leland told him that he was "starting trouble" and that he needed "to turn around and go back to whatever [he] was doing, go back across the street." Jerry came across the street and "grabbed [the petitioner] and took him back over there."

Emma Tatum then joined Leland and Bishop on their porch. One of the men called the police. While they were waiting for the police to arrive, a man Leland knew as "Mr. Johnson" came and picked [the petitioner] up in a red car and drove him away.

The police arrived and spoke with Bishop for a few minutes. Leland testified that soon after the police left, he heard Jerry Lumpkin say into his cordless phone, "go get your gun." Jerry had walked down his porch steps and

---

[1] When he took the witness stand, Bishop Tatum introduced himself as "Bishop Fredric L. Tatum." On cross-examination, he acknowledged that "Bishop" was a title. However, all of the other witnesses referred to him in their testimony as "Bishop," using that word as a first name would typically be used. Therefore, we use that designation, where appropriate, as well.

was passing by on his way up his driveway when Leland overheard Jerry's words. Hearing this alarmed Leland "a little."

Leland's wife joined the other three people on the Tatums' porch. While they were talking, Emma Tatum told them to "look" and pointed out that the same red car that had just left with [the petitioner] was returning. Leland turned and looked and acknowledged that it was the same car. As the car drove down their street, Emma Tatum said, "look out you-all, he's got a gun." Leland testified that, as he

> turned around and looked that's when the first shot was fired. And, the first shot was fired like near the driveway. . . . And the second shot was fired as though it's going almost near the house. . . . Then he fired the third shot. . . . But, that fourth shot, when he fired the fourth shot, my mother was trying to get into the house, she was pushing my brother inside the door then.

According to Leland, the fourth shot hit Emma Tatum because after that shot, he heard her "holler" that she had been hit. A fifth shot was fired. The car got to the corner and made a right turn and stopped. Leland testified that, as he was looking at [the petitioner], who was in the passenger seat of the red car, [the petitioner] fired a sixth shot. Leland was approximately twenty-five feet from [the petitioner] at this time. [The petitioner] was not wearing a mask and Leland got "a good look" at him. After firing the sixth shot, the car in which [the petitioner] was riding "proceeded on. And he left."

Leland stated that, "when he fired the first shot everybody was like in a panic, . . . trying to run." As his mother and brother were trying to get inside the house through one door, he "had to push [his] wife down on the porch, push her down and hold the door open on [the other] side, holding the door so she could crawl inside the house." After he helped his wife get inside, he "was trying to run over to [his] mom to push her inside . . . but [he] just didn't get there fast enough."

When asked where his mother was at the time she got shot, Leland testified:

> She was, my mother was going inside the door. The door was open and when she got hit from that bullet she was standing up, she was pushing my brother inside during that time. Pushing

him inside the house. She was on her way through the door, trying to get in. That's where she was at. She was trying to get in, she wasn't directly in the house, she was trying to get inside the house.

According to Leland, [the petitioner] and his mother were on speaking terms and he knew of no problems she had ever had with [the petitioner]. Leland also testified that he had had no problems with [the petitioner] or [the petitioner]'s father.

On cross-examination, Leland testified that he saw no gun "out there" other than the one he saw [the petitioner] holding and shooting. He described its color as "[c]hrome, silver chrome." The time was between 7:30 and 8:00 in the evening. He admitted that he had heard his brother Bishop refer to Jerry Lumpkin as a "dope dealer." He also explained that, after [the petitioner] initially crossed the street and told Bishop that he wanted to fight, Bishop told [the petitioner], "you don't know who you're messing with" and that he would "whip [the petitioner] like [his] mother should have whipped [him]."

Bishop Tatum testified that, on the evening of the shooting, he saw [the petitioner] fighting with one of his father Jerry's friends in Jerry's yard. After the fight, [the petitioner] came over and told Bishop he wanted to fight Bishop. Leland intervened and said, "no, ain't going to be none of this." Jerry Lumpkin crossed the street and retrieved his son. Jerry then asked a man named Johnson to take [the petitioner] home, and Johnson picked [the petitioner] up in a red four-door car. Bishop thought that Leland then called the police. The police arrived and took a report.

After the police left, Bishop and Leland were standing on the sidewalk. Bishop heard Jerry tell someone over the cell phone to "kill everybody on the porch." Bishop and Leland returned to their porch. A few minutes later, Bishop saw the red car at the corner of his street. His mother said, "he got a gun." Bishop described the gun as "black." Bishop testified that he saw [the petitioner] "pointing out the car and he started shooting." Bishop stated that Harry Johnson was driving the car. In an effort to avoid the bullets, Bishop pushed his mother down and she pushed him down. He said that there were about six shots.

Bishop stated that the car in which [the petitioner] was riding drove "slow" as it passed their house. Bishop saw [the petitioner] "in the front seat

but laying back. He was shooting out the car." [The petitioner] was on the right side of the car shooting out the right back window. Bishop testified that it was still daylight during the shooting and he saw [the petitioner]'s face clearly. When the first shot was fired, they "ducked . . . [and] pushed one another down on the porch." Bishop stated that he did not have a gun at the time and nobody on the porch shot at [the petitioner].

Bishop Tatum acknowledged that he had had a disagreement with Jerry Lumpkin the first time they met several years previously. The problems continued over the years with Bishop calling the police about drug dealing on the street and Jerry threatening him after the calls. He did not have any problems with [the petitioner], however, prior to the July 19, 2003, shooting.

Bishop testified that his mother was standing when she got shot but he also stated that she was "bending" during the shooting. He could not describe how she was "bending" because he was looking at [the petitioner] "the whole period of time when he was shooting." He stated, "I pushed my mama down when the first shot up [sic], okay. My mother was trying to push me down, I was pushing her down."

Essie Tatum, Leland's wife, testified that she and Leland arrived at the duplex between 6:30 and 7:00 p.m. Bishop was there when they arrived. She went inside and later saw the victim outside talking with Leland and Bishop. It was then between 7:30 and 8:00 p.m. She went out on the porch and "all of a sudden" she heard Leland say "they shooting." The next thing she knew, she was pushed down onto the porch and she crawled through the door. She heard the victim say she had been shot. She did not see the shooting but she heard the shots.

Harry Johnson testified that he had known Jerry Lumpkin about forty years and [the petitioner] about fifteen years. He arrived on Speed Street at about 7:00 p.m. on July 19, 2003. As he was driving by Jerry's house, Jerry beckoned for him. When he responded, Jerry asked Johnson to take [the petitioner] home. When Jerry made this request, Jerry and [the petitioner] "exchanged some words, like a heated argument." As requested, Johnson took [the petitioner] home. The time was between 7 and 8 p.m. Johnson took [the petitioner] over to Olympic Street, "about three streets over." The trip took three or four minutes. After he dropped [the petitioner] off, a woman came out on the porch and "hollered" at him. He stopped and [the petitioner] came out of the house and got back in the car. [The petitioner] told him he wanted to go

back to his father's house. Johnson complied; he did not see a weapon.

Johnson described his car as a 1991 Cutlass Supreme, red, four-door with reclining seats in the front. Johnson stated that, when [the petitioner] got back in the car, he "immediately reclined the seats." [The petitioner]'s demeanor was tense and "stressed out." The trip back to Speed Street took three to five minutes. The sun had set but there was still light. As Johnson was looking for a parking place on Speed Street, [the petitioner] told him not to worry about parking. At that point, Johnson testified, "gunfire erupted." Johnson did not initially realize where the gunfire was coming from; he ducked. Johnson testified: "After about five shots [the petitioner] sat up but didn't let the seat up and reached over and grabbed my steering wheel and said, pull off fool." Johnson described himself at this time as "in somewhat of a panic." He saw that [the petitioner] had a pistol "when he brought his hand back in the window." Johnson described the gun as "a large caliber revolver, blue steel with about a six inch barrel." He had not seen the gun previously and did not know that [the petitioner] had a gun in his possession.

Johnson testified that, when the shooting started, he

like panicked, [he] was ducking and trying to determine where the shots were coming from. And, at which time [the petitioner] grabbed the steering wheel, reached over and grabbed the steering wheel, stuck his foot on the accelerator and hollered, drive fool. And, that's when [he] seen [sic] the pistol in [the petitioner]'s hand.

Both men struggled for control of the car. They reached the corner where there was "a bunch of people." [The petitioner] continued to press on the accelerator and the car "almost ran into" the people gathered at the corner. Their flight continued with [the petitioner] steering and pressing the accelerator, running stop signs, and getting "very close" to striking pedestrians. After traveling down several streets, [the petitioner] jumped out of the car. He told Johnson that Johnson "don't know nothing and don't want to know nothing, forget about it." Johnson became fearful for his life because [the petitioner] had been "shooting on a crowded porch of people, that appeared to be someone out of control and don't care anything about anyone."

On cross-examination, Johnson stated that his car was stopped in front of the duplex when the gunfire began. Then [the petitioner] grabbed the

steering wheel and pushed the accelerator down. They drove to the corner and turned; they did not stop at the corner and Johnson did not recall [the petitioner] firing another shot at the corner.

Officer Devin Rogers of the City of Memphis Police Department testified that he responded to the Tatums' first call to the police, which was made before the shooting. He spoke with both Leland and Bishop. He then left and returned to his regular patrol. He responded to the second call, made after the shooting, and arrived at 9:06 p.m. He found "a lot of hysteria and pandemonium because Ms. Tatum had been shot." Leland told him [the petitioner] had shot his mother; Bishop reiterated this information. Officer Rogers requested an ambulance. Emma Tatum was taken to The MED hospital where she underwent several surgeries. Emma Tatum remained in the hospital where she died on September 13, 2003.

Sergeant Maurice Savage of the City of Memphis Police Department testified that he participated in the ongoing investigation of the shooting and arrested [the petitioner] on July 22, 2003.

Dr. O'Brian Cleary Smith, previously the medical examiner for Shelby County, testified that his office performed an autopsy on the victim, Emma Tatum. He opined that the victim "died as a result of a gunshot wound to the pelvis." The autopsy revealed that the bullet entered the victim's body on the right buttock and lodged in the left hip joint. Dr. Smith testified that the "bullet entered her body going slightly from back to front with up and down and right to left to lodge in the socket of her hip joint on the left side of her body." He explained that, assuming the perspective of a person standing upright when shot,

> [t]he bullet would have traveled first off from the right side of her body to the left side. It also would have descended in the body or going down in the body to a point lower than where it entered. And, it also would have gone from the back side of the body more forward towards the front but actually more like in line with the hip joint which is not fully to the front.

On cross-examination, Dr. Smith was asked to hypothesize that the bullet that struck the victim was fired from a car driving along a street that was several feet below the level of the porch on which the victim was located when she was shot and that the victim was standing upright at the time she was shot.

Dr. Smith responded that, "[g]iven that description of circumstances it's difficult to resolve," referring to the trajectory of the bullet through the victim's body. He said that, if the bullet had been fired in an upward direction, "she would have to be leaning over or canted over towards the right side, towards the bullet." Given a different hypothetical in which the bullet was fired from the porch across the street, and in which the victim was standing upright on both feet, Dr. Smith stated that "it would be easier to achieve that trajectory of the bullet through her body by a person who's standing on that porch and shooting slightly downward."

On redirect, Dr. Smith reiterated that "it's very difficult to render an opinion as to what exact position a person was in at the time that they received the gunshot wound." He testified that "[i]f a person is being pushed down or pushed off to the side, . . . with the right side of the pelvis is lower and the left side of the pelvis is higher then it may be possible for a wound of that type to be produced by a shot fired from below." Dr. Smith also testified that it was possible for a gunshot fired from the street up toward the porch to have caused the path in the victim's body if the victim had been crawling on the palms of her hands and knees with her head "a little bit angled towards the street and also have the left side of [her] pelvis higher than [her] right." Dr. Smith further acknowledged that it was possible for the bullet to have changed paths if the bullet had struck an object prior to hitting the victim's body.

[The petitioner] presented no proof. His defense theory focused on weaknesses in the prosecution's case, particularly the incongruities between the angle at which he allegedly fired the gunshots and the bullet's path through the victim's body.

The jury convicted [the petitioner] of the first degree murder of Emma Tatum; the attempted first degree murder of Bishop Tatum, a Class A felony; the knowing aggravated assault with a deadly weapon of Leland Tatum; and the knowing aggravated assault with a deadly weapon of Essie Tatum, both Class C felonies. [The petitioner] was subsequently sentenced to life imprisonment for the murder; to twenty-three years imprisonment for the attempted murder; and to five years imprisonment for each of the aggravated assaults. The trial court ordered the sentence for the attempted murder to run concurrently with the life sentence. The trial court ordered the sentences for the aggravated assaults to run consecutively to each other and to the other sentences, resulting in an effective term of life plus ten years.

State v. Allen, 259 S.W.3d 671, 674-79 (Tenn. 2008).

This court affirmed the petitioner's convictions and sentences on direct appeal, and the Tennessee Supreme Court affirmed this court following discretionary review. On December 2, 2008, the petitioner filed a *pro so* petition for post-conviction relief. Following the appointment of counsel, the petition was twice amended. An evidentiary hearing was conducted on July 24, 2009.

At the hearing, the petitioner testified that trial counsel only met with him one time prior to trial and that meeting lasted five to ten minutes. He said that they did not discuss the facts of the case, whether there were any defense witnesses, or possible theories of defense. He was uncomfortable on the day of trial "because we had no preparation, no defense or nothing. It was just like I went in blindfolded." The petitioner claimed that he was unaware of his trial date until the day of trial.

On cross-examination, the petitioner admitted that trial counsel appeared in court on his behalf five to eight times prior to trial but said counsel only talked to him in open court. The petitioner said that he told trial counsel that his girlfriend would serve as an alibi witness. However, counsel determined that she would not be a good witness because the district attorney had some CD recordings of conversations between her and the petitioner.

The petitioner testified that his "father had caught a manslaughter charge" in the early 1990's resulting from an altercation in the Speed Street and Jackson Avenue area – the area where the offense in his case took place. The petitioner recalled that at the beginning of jury selection, a potential juror stood up and said that "someone kilt [sic] her brother on the corner of Speed and Jackson, someone named Lumpkin of that nature" and that "she didn't know that this was my first offense or not[.]" The petitioner recalled that the court dismissed the juror, but there were other prospective jurors in the courtroom that gave him "stares and glares like that wasn't my first time being on trial for first degree murder. So it was looking like I done got away with murder the first time[.]"

The petitioner noted that trial counsel requested a bench conference and moved to strike the venire. Instead, the court gave a curative instruction but did not poll the prospective jurors to determine the effect of the comment. The petitioner felt that the outcome of his trial would have probably been different had the jury not contained individuals who had heard the comment. The petitioner agreed that trial counsel did nothing wrong in handling the juror issue. On redirect, the petitioner acknowledged that the trial court instructed the jury that the individual the juror was referring to was not related to the petitioner.

The petitioner testified that he retained appellate counsel to handle his appeal. Appellate counsel discussed the possible issues to appeal with the petitioner, including "the jury issue." The petitioner said that appellate counsel did not include the issue regarding the juror in his Rule 11 application to the Tennessee Supreme Court even though he had discussed with appellate counsel on several occasions that the issue was important to him. On cross-examination, the petitioner admitted that the court of criminal appeals addressed the juror issue and found no error. The petitioner also admitted that he did not know whether appellate counsel included the juror issue in the Rule 11 application and the supreme court just decided not to take up the issue.

Trial counsel testified that the theory of defense for the petitioner's case was that the petitioner was not the shooter. Counsel recalled that the petitioner said that his girlfriend could provide his alibi; however, he elaborated, "I don't remember what it was, but at the time there was much more danger to that than there was profit in it in terms of presenting it." Counsel also discussed with the petitioner the considerations for calling his father as a witness.

Trial counsel recalled that during the first hour of jury selection, a potential juror "blurted out in the presence of the panel that she was familiar with or knew about a Lumpkin and a killing or a murder on Speed Street." Counsel immediately moved to strike the panel, and he could not think of anything in hindsight that he could have done to better address the issue. Counsel felt that the potential "of taint or prejudice was just significant"and doubted whether a precautionary instruction would cure the problem. Counsel testified that appellate counsel handled the petitioner's appeal as well as sentencing. Counsel recalled that the defense strategy was to suggest, through the physical evidence and the State's witnesses, that the petitioner's father was the shooter.

The petitioner did not call appellate counsel to testify at the evidentiary hearing.

In denying the petition, the post-conviction court found, as relevant to the issues at hand, that appellate counsel filed an extensive brief and thoroughly argued the issues on direct appeal. The court noted that it was not clear whether appellate counsel included the juror issue in the application for permission to appeal, but the juror issue was thoroughly addressed by the court of criminal appeals and "there's nothing to indicate that the State Supreme Court wasn't aware of that [issue]." The court observed that the juror's statement "would appear on its surface to be very prejudicial to [the petitioner]"; however, the trial court fully admonished the jury, including that "it was not the same family[.]" The court concluded that the petitioner received effective assistance from both trial and appellate counsel and that the trial court did not err in failing to strike the jury venire.

## ANALYSIS

### Standard of Review

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the trial court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

### Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. See U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The same principles apply in determining the effectiveness of trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). In order to establish the ineffective assistance of appellate counsel, a petitioner must prove that (1) appellate counsel was objectively unreasonable in failing to raise a particular issue on appeal, and (2) there was a reasonable probability that the petitioner's appeal would have been successful before the state's highest court had appellate counsel not rendered deficient performance. See, e.g., Smith v. Robbins, 528 U.S. 259, 285-86 (2000); Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Mayo v. Henderson, 13 F.3d 528, 533-34 (2d Cir. 1994).

The petitioner raises two interrelated issues arguing that the post-conviction court erred in finding that appellate counsel rendered effective assistance even though counsel "failed to cite dispositive case law from the Tennessee Supreme Court that required Petitioner's case to be reversed" and "failed to present an effective legal argument regarding the prejudicial information [the juror] disclosed during voir dire." The petitioner asserts that had appellate counsel cited and argued State v. Scruggs, 589 S.W.2d 899 (Tenn. 1979), "in lieu of the deficient argument" presented, there is a reasonable probability that the outcome of his appeal would have been different. In making his argument, the petitioner urges that this court "infer that the jury attributed the homicide to which [the] prospective juror, . . ., referred to the [petitioner] or his family."

Initially, contrary to the petitioner's assertion, nothing in the record gives rise to an inference that the seated jury considered the juror's statement for any purpose. During voir dire, the following exchange occurred between the trial court and the juror:

THE COURT: Is there any reason you can't be on this jury?

[THE JUROR]: I don't think, yeah. I think it is.

THE COURT: And, what is that reason?

[THE JUROR]: My brother was killed in 1999 right at the corner of Speed and Jackson by a Lumpkin. I don't know if that's his first offense but Lewis

-12-

Lumpkin was the father of the Lumpkin person.

THE COURT: Okay. You don't need to say anymore. I will excuse you for cause.

Trial counsel immediately requested a bench conference and moved to strike the jury panel. The court denied the motion and gave the following limiting instruction:

Ladies and gentlemen . . ., you just heard some comments that were made by that last potential juror, . . ., that . . . I don't want you to be considering . . . . Actually, I want you to put them out of your mind. You cannot consider any of the comments that [the juror] just made in this matter at all. And furthermore, I want you to know for the record that whoever that Lumpkin[] was that she was referring to is not related to this defendant in any way whatsoever. And, obviously, it's not the defendant nor any relation to him and it's pure coincidence that she happened to know a Lumpkin [who] lived somewhere near the Speed address. But, . . ., you do need to know, I'm not telling you just to put this out of your mind. I am telling you to put it out of your mind but it simply is not true. And, you need to know that [neither] this defendant nor any member of his family was involved in anything like that.

Nothing in the record indicates that the jury did not obey the curative instruction given by the trial court. See State v. Gilliland, 22 S.W.3d 266, 273 (Tenn. 2000).

In addition, we have reviewed the brief prepared by appellate counsel for the petitioner's direct appeal, and it shows that the juror issue was a key issue on appeal and was thoroughly addressed by counsel. Although the petitioner challenges appellate counsel's strategy of comparing the situation in his case to that of pretrial prejudicial publicity and extraneous prejudicial information during deliberations, it is apparent from reading the brief that appellate counsel was attempting to analogize this uncommon situation to other situations where a jury's impartiality is questioned. It appears that counsel was trying to highlight that the petitioner was entitled to a jury free of any partiality or outside influence and that the verdict was unreliable because of the information communicated by the juror. The manner in which appellate counsel briefed the issue on direct appeal, while not the most concise, was arguably a tactical strategy and not deficient performance.

Moreover, we discern no prejudice from appellate counsel's failure to cite and argue Scruggs. In Scruggs, a potential juror responded to a question during voir dire that he knew the defendant. 589 S.W.2d at 899. When asked how he knew the defendant and how well, the potential juror responded that he was "a probation officer, and [he] had him under [his]

supervision at one time." Id. at 899-900. The trial court excused that potential juror and gave a cautionary instruction that the jury could not consider the defendant's past. Id. at 900. The defendant was ultimately convicted of armed robbery and sentenced by the jury to twenty-five years imprisonment. Id. at 899. This court affirmed on appeal, concluding that the limiting instruction cured any error, and even if the instruction was insufficient, any error was harmless. Id. at 900. The Tennessee Supreme Court reversed, reasoning that it could not say beyond a reasonable doubt that the limiting instruction cured the prejudicial effect of the potential juror's statement. Id. at 901.

Despite the petitioner's contention that Scruggs would have changed the outcome of his appeal due to the similarities between it and his case, we discern two key differences that suggest Scruggs would not have had any effect on the outcome. First, in Scruggs, the jury sentenced the defendant to twenty-five years for an armed robbery conviction, which was "two and one-half times the minimum sentence." Id. at 901. The court hypothesized that one possible reason for the harsh sentence imposed by the jury was because the jury knew that the defendant had been shown leniency in the past. Id. Here, the petitioner was convicted of first degree murder; thus, the *minimum* sentence he faced was life imprisonment, which was the sentence he received.

Second, in Scruggs, the statement made by the potential juror clearly and without question related to that actual defendant. Here, the juror's statement did not clearly identify the petitioner as having been involved in a prior offense, and the trial court's instruction and the evidence later introduced provided that neither the petitioner nor his family was involved in the offense mentioned by the juror.

We note that two other panels of this court have distinguished Scruggs before on facts potentially more prejudicial than the facts in this case. See State v. Bowers, 77 S.W.3d 776, 782-83 (Tenn. Crim. App. 2001); State v. James Morning Craft, Jr. & Lewis Moorlet, No. 31, 1989 WL 19678, at *4 (Tenn. Crim. App. Mar. 8, 1989), perm. to appeal denied (Tenn. Aug. 7, 1989). For these reasons, we cannot conclude that even if appellate counsel was deficient in failing to cite and argue Scruggs, that any deficiency caused the petitioner prejudice.

We further discern no prejudice caused by the manner in which appellate counsel briefed the issue. This was not a case where this court on direct appeal did not address an issue due to an insufficient argument. Quite the contrary, this court fully addressed whether the extraneous prejudicial information contaminated the jury venire, concluding that it did not. See State v. Eric Lumpkins, No. W2005-02805-CCA-R3-CD, 2007 WL 1651881, at *6-7 (Tenn. Crim. App. June 7, 2007), perm. to appeal granted (Tenn. Oct. 15, 2007), aff'd Allen, 259 S.W.3d at 671. In addition, the standard for reversal from Scruggs that "'[t]he

reviewing court will reverse a conviction where it cannot say from the record that the evidence erroneously admitted was not prejudicial to [the] accused, or that it did not affect or contribute to, the verdict rendered,'" Scruggs, 589 S.W.2d at 900 (quoting 24B C.J.S. Criminal Law § 1915(2) (1962)), and the standard advanced by counsel on direct appeal that once an "impermissible communication is shown to have occurred, there is a presumption that the defendant has been denied the right to a fair and impartial jury . . . [and] the burden is on the State to demonstrate that the improper communication did not influence the verdict to the prejudice of the defendant," are substantially similar.

## CONCLUSION

Based on the foregoing authorities and reasoning, we conclude that the petitioner has not met his burden of showing that appellate counsel was ineffective in his representation. Accordingly, we affirm the denial of the petition for post-conviction relief.


_____
ALAN E. GLENN, JUDGE